EVANS *v.* DETROIT, GRAND HAVEN & MILWAUKEE
RAILWAY CO.

RAILROADS—CARRIERS—MASTER AND SERVANT—DEATH.

In an action under the Federal statute affecting the right
of employees to recover for negligent acts of fellow-
servants or others (35 U. S. Stat. 65; U. S. Comp. Stat.
Supp. 1911, p. 1322), evidence tending to show that de-
fendant's employee, in charge of the main repair track,
permitted cars to be backed upon the track while deceased
and another car repairer were working on one of the cars,
without warning or notice to them, and that such track
was their usual place of work, *held,* to present an issue
for the jury as to the negligence of such fellow-servant.

Error to Oakland; Smith, J. Submitted April 30,
1914. (Docket No. 10.) Decided July 24, 1914.

Case by Fred J. Evans as administrator of the
estate of David C. Harsen, deceased, against the De-
troit, Grand Haven & Milwaukee Railway Company
for the unlawful killing of decedent. Judgment for
plaintiff. Defendant brings error. Affirmed.

*Harrison Geer,* for appellant.

*B. F. Reed* (*Pelton & McGee,* of counsel), for ap-
pellee.

MOORE, J. This action is brought to recover dam-
ages sustained by decedent on the 12th day of Decem-
ber, A. D. 1910, while he was engaged as a car re-
pairer in the yards of defendant at Durand, Mich.
Decedent died the morning after he was hurt. The
action is brought for the benefit of the widow, Blanche
Harsen, who was 22 years old at the time of the trial,
and her posthumous daughter, born on the 3d day of
February, A. D. 1911. Counsel conceded upon the

trial of the case that the defendant was at the time of the accident engaged in interstate commerce, and that decedent was repairing a car engaged in such commerce, and that the cause of action is controlled by an act of Congress approved April 22, A. D. 1908, and the amendments thereto, entitled:

"An act relating to the liability of common carriers by railroad to their employees in certain cases."

From a verdict and judgment in favor of the plaintiff, the case is brought here by writ of error.

The accompanying plat will help to understand the situation.

The southernmost track somewhat circular in its course is called the lead track, and by means of switches cars may be shunted from it to all the tracks by opening and closing switches. The tracks numbered from 1 to 6, inclusive, are used for storage of cars, making up trains, and such other purposes as are incident to a comparatively large railroad yard. Tracks A, B, and C are used almost wholly for the resting place of cars while undergoing repairs.

The workmen making repairs on cars placed on tracks A and B are protected by rule 160, which reads:

"A blue flag by day and a blue light by night, placed on or at the end of a car, engine, or train, denote that workmen are at work under or about the car, engine, or train.  The car, engine, or train thus protected must not be coupled to or moved until the blue signal is removed by the person who placed it.  When a car, engine, or train is protected by a blue signal, other cars must not be placed in front of it so the blue signal will be obscured, without first notifying the workman, that he may protect himself."

It was thought this rule did not sufficiently protect the men at work on track C, and in 1908 rule No. 160 was abrogated as to track C, and locks upon the switches, instead of the blue flag, were used from that time until the accident to decedent.  Assistant Foreman Anthony Seeburger had possession of one of the keys to the Yale lock upon these switches.  A second key was kept in the office to be used in case Seeburger was not present.  When the switching crew desired to place cars upon or take them from track C, it was necessary to secure Mr. Seeburger to unlock the switch, as the ordinary switchman's key would not open the locks.

But one error is urged, namely:  That it was error upon the part of the trial judge to submit to the jury the question of whether or not Anthony Seeburger was guilty of negligence in the premises; counsel claiming there is no evidence in the record of any negligence upon his part.

We quote from the brief of appellant:

"Any cause of action which plaintiff has is therefore governed exclusively by the Federal act of April 22, A. D. 1908, and the amendments thereto.  Section 1 of the act provides, in substance, that every common carrier railroad company, while engaged in interstate commerce, shall be liable in damages to any of its employees injured while engaged in such commerce 'if such injury or death resulted in whole or in part from the negligence of any of the officers, agents or em-

ployees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment.'    Section 3 of this act provides, in part, as follows:

"'The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.'

"The trial judge instructed the jury according to the provisions of section 3 of the act in paragraph No. 12 of his charge.

"It is clear from the provisions of this Federal act that, if Anthony Seeburger was guilty of negligence in the premises which caused, or contributed to cause, the injury to plaintiff's decedent, then there can be a recovery in this case.

"The amount of damages to be recovered depending upon whether plaintiff's decedent was himself guilty of contributory negligence, it was the duty of the trial judge, under the Federal act of April 22, A. D. 1908, to say, in the first instance, whether there was any evidence introduced upon the trial of the cause tending to prove actionable negligence.    If there was no evidence of actionable negligence, then it was the duty of the trial judge to instruct the jury to return a verdict in favor of the defendant railway company.    *Central R. Co. of New Jersey* v. *Young,* 200 Fed. 359, 118 C. C. A. 465."

"We requested the court in our eleventh request to charge to instruct the jury as follows:

"'(11) I charge you that Anthony Seeburger, defendant's assistant car foreman, at Durand station, was not guilty of any negligence in the premises.'

"This request was refused by the trial judge, and he instructed the jury as follows:

"'The claim of plaintiff is that the negligence in this case on the part of the defendant's agent, Anthony Seeburger, consisted in an act of omission; that is, he unlocked the switch and failed to notify the parties working under the cars, if any.'

"The negligence, therefore, which it is claimed Assistant Foreman Seeburger was guilty of is that he

did not notify Harsen and Rothermal that the main repair track was to be pulled and then filled with bad-order cars."

As stated before, it is insisted by counsel for appellant that no act of negligence on the part of Mr. Seeburger was shown. On the other hand, it is claimed that Mr. Harsen was doing work of a character and at the place and in the manner he was expected to do it, and that his injuries are directly traceable to the negligence of Mr. Seeburger. It is clear that the issue involved is one of fact, and whether there was evidence justifying its submission to a jury requires a further examination of the record.

Mr. Harsen entered defendant's employ as a car repairer on the morning of November 15, 1910, and worked there daily until he received his injury on the afternoon of December 12th. There were 10 or 12 men working as car repairers in this yard. They worked in pairs; Mr. Harsen working with Mr. Rothermal. The most of the car repairing was done upon track C. The new repair track (A) and steam track (B) werę also used as repair tracks. Track C was approximately 800 feet long, with a capacity of about 22 cars, with allowance of space for separating cars as required in making repairs, and track B was about 300 feet long, with a capacity of 8 cars. Track A was shorter than the others.

Cars having only minor defects would be repaired where they stood on the switch tracks out in the yard; but those requiring more important repairs would be appropriately marked by the inspectors, and would afterwards be picked out from the others by the switching crew and moved to the repair track. After being here repaired, the cars would be withdrawn from the repair track and placed again on the switch tracks for distribution among trains. Several switch engines and crews were employed in the yard, and switching

181 Mich.—27.

was constantly going on during working hours. Track C was used exclusively for the work of repairing cars, and it was here that most of the car repair work was done.

Car repairers did not work at night, except in case of emergency, and it was usually at night, when they were absent from the yard, that the repaired cars would be removed from track C (called "pulling" the track), and the track refilled with defective cars for the repairers' work the next day. Occasionally this track would be pulled and wholly or partially refilled during the repairers' working hours. When pulled, the track would usually be refilled to its full capacity, but not always.

The deceased began work as usual on track C in the morning of December 12, 1910, and worked there all the forenoon and the early part of the afternoon.

Mr. Rothermal testified that after dinner he and the deceased resumed work on track C, working near the "shop," and, after working there "maybe a couple of hours," were sent by Mr. Seeburger to repair some cars on the track B. After working on track B "not such a great while, probably an hour," they finished their work there and started for the "shop," thus apparently returning to or towards the place where they had been at work on track C before going to track B. On this course they would naturally pass the office, which was located in the east end of the long shop building. On their way they were met by Mr. Seeburger, in company with a carpenter, Mr. Mastin, and were directed by Mr. Seeburger to assist Mr. Mastin in blocking some trucks loaded on a flat car that was standing on one of the switch tracks. Mr. Rothermal and the deceased crossed track C through an opening between the cars and proceeded to a point west of the ice house, where they each procured a tie and carried it back across the repair track and around the office end of the long building shown in the plat, to the north

side of it, and over to the flat car upon which the trucks were loaded. The witnesses do not specify the particular switch track upon which this flat car stood; but there was at least one switch track filled with cars between it and the repair tracks, so it is claimed the view of track C from the flat car would be obstructed. Before going after the ties, deceased and Rothermal left their tools at the door of the toolhouse, which was a room in the long shop building used for storing tools, and located west of that part of the building occupied by the carpenter shop. The time they were detained at the flat car was stated by the witnesses at from 30 to 50 minutes. Returning from the flat car at the end of this time, the deceased and Mr. Rothermal took their tools from where they had left them, and, not seeing Mr. Seeburger, they went west along track C to a group of cars standing on that track toward the west end of it, and had just begun work on the first of these cars when other cars were pushed against the opposite end of them, setting them in motion and fatally injuring the deceased.

Mr. Seeburger was not a witness at the trial; his absence was accounted for by his illness. After sending the deceased and Mr. Rothermal to the flat car, and while they were thus absent from the vicinity, and, it is claimed, out of sight of track C, Mr. Seeburger unlocked the switch at the west end of that track and directed a switching crew to pull the track and refill it. At this time six of the cars then on the track were unrepaired. The switchmen pulled all the cars from the track and, separating the unrepaired cars from those that had been repaired, left the latter on switch track No. 2, and shoved or kicked the six unrepaired cars back down the lead track, so that they rolled into the west end of track C, and there stopped. The switch crew then went on switch track No. 3; and there, coupling to a string of 21 out of order cars,

pulled them out on the lead track and pushed them down the lead track to the west end of track C, where they struck and set in motion the six cars previously left there, and upon one of which deceased was then at work.

It is the claim of plaintiff that Mr. Seeburger had determined to pull these cars on track C some time before he sent the deceased and Mr. Rothermal to the flat car, and that at the time he directed them to go he was preparing to pull the track, and in fact caused it to be pulled almost immediately after they left, and that he should have so stated to Mr. Harsen and Mr. Rothermal, as their usual place of work was on track C.

The claim of plaintiff is stated in the brief as follows:

"It is perfectly apparent, as we think, from the evidence heretofore reviewed by us, that at the time Seeburger directed the deceased and Rothermal to go with Mastin to the flat car he was preparing to pull the main repair track, and then expected to have it pulled almost immediately; and it is altogether likely that he had planned to pull the track before he had sent the deceased and Rothermal to the steam track, for, as we have seen, he so informed Jewell and Arnold near the same time when directing them to fix the brakebeam. Yet Rothermal testified that Seeburger did not inform him and the deceased that he would pull the track, or warn them to stay away from it, at the time he sent them to the flat car with Mr. Mastin, or at any other time that day. * * *

"Defendant's witness Arnold testified that when the main repair track was being pulled, Seeburger would be at the switch, or 'up around there,' and that it was his custom to be around the track when it was being pulled and refilled during working hours. Yet on this day nobody saw him from the time he unlocked the switch until after the accident. Conductor Green of the switch crew that pulled the track did not see him again during working hours that day after he had unlocked the switch. Arnold, who was working near

the place of the accident, did not see him from the time the track was pulled until after the accident. Jewell, who was with Arnold, does not mention seeing Seeburger after the latter had gone to give orders to pull the track. Rothermal says that Seeburger was not in sight when he and the deceased came from the flat car to the shop for their tools and went up the track to the car where the accident happened, and that he first saw him coming from the east a few minutes after the accident. No other witness testified to having seen Seeburger between the unlocking of the switch and the accident. * * *

"The situation presented, therefore, by the conceded facts and the inferences fairly warranted by the evidence, is this: Mr. Seeburger, who alone possessed the power of safety or danger over the main repair track, at a time when that track was a place of safety, and a considerable portion of the cars thereon were yet unrepaired, and shortly before, as he knew, he would convert it into a place of danger, and while he was preparing to make the change, sent the deceased away from the vicinity of that track to a place where observation of it was cut off, on an errand which he (Seeburger) knew was but temporary, without giving deceased any warning of the proposed change on the main repair track, or any direction as to his work after the temporary errand should be accomplished, and, while deceased was thus absent by direction of Seeburger, the latter changed the track from safety to danger and then dropped out of sight, so that when deceased returned neither Seeburger nor any one in his place was there to either direct the deceased where to work or warn him away from the main repair track, and thereupon the deceased voluntarily went upon the track to work, without discovering the danger, and was injured."

There is testimony tending directly and by reasonable inference to sustain these contentions made on the part of the plaintiff.

The respective rights of employers and employed under the Federal statute involved here, and its various amendments, have received the careful attention of the Federal courts, and full discussions may be

found in *Second Employers' Liability Cases*, 223 U. S. 1 (32 Sup. Ct. 169, 38 L. R. A. [N. S.] 44) ; *Michigan Central R. Co.* v. *Vreeland*, 227 U. S. 59 (33 Sup. Ct. 192) ; *St. Louis, etc., R. Co.* v. *Hesterly*, 228 U. S. 702 (33 Sup. Ct. 703) ; *Central R. Co. of New Jersey* v. *Young*, 200 Fed. 359, 118 C. C. A. 465; *Grand Trunk Western R. Co.* v. *Lindsay*, 201 Fed. 836, 120 C. C. A. 166; *Louisville, etc., R. Co.* v. *Wene*, 202 Fed. 887, 121 C. C. A. 245; *Pennsylvania R. Co.* v. *Goughnour*, 208 Fed. 961, 126 C. C. A. 39.

Under the principles of law stated in these cases, especially the last two, we think it cannot be said, as a matter of law, that there was no negligence shown on the part of Mr. Seeburger.

Judgment is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.