МАRY E. GILLIS, administratrix, _vs._ NEW YORK, NEW HAVEN, AND HARTFORD RAILROAD COMPANY.

Suffolk.    March 24, 1916. — June 23, 1916.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, & PIERCE, JJ.

_Negligence,_ Railroad, In a freight yard. _Railroad. Evidence,_ Relevancy. _Witness,_ Cross-examination.

In an action against a railroad corporation under the federal employers' liability act to recover for the death of a freight conductor in the defendant's employ, evidence that, after the deceased had had a conversation with the defendant's yardmaster at the freight yard where the accident occurred, the deceased returned to his train and said to the engineer that, after dropping certain freight cars, he was going to return with the engine on a certain track, which turned out not to be clear and on which the accident happened, is not evidence that the yardmaster told the deceased to return on that track.

In the same case it was _held,_ that the yardmaster, having had no reason to suppose that the deceased would try to return on the occupied track, was under no duty to warn him not to do so.

In the same case it was _held_ that under the circumstances disclosed by the evidence it was the duty of the deceased, after having delivered the cars that he had brought to the freight yard, to go to the yardmaster to ascertain what track he was to use in going out.

In the same case the plaintiff contended that under the rules of the railroad corporation the engineer was responsible equally with the deceased conductor for the proper handling of the train and relied on a rule of the defendant in regard to engineers which contained the provision, "Should there be any doubt as to the right of road, or safety of proceeding, from any cause, consult with the conductor and be equally responsible with him for the safety and proper handling of the train." But other rules of the defendant provided as follows: "Engine Men. On the road, obey orders of the conductor as to starting, stopping, shifting cars; as to general management of the train, unless such orders endanger the safety of the train or would require a violation of the rules or cause injury to persons or to property," and "Conductors. Be responsible for all switching move-

ments." *Held,* that the rule first quoted in regard to the responsibility of engineers must be construed in connection with the other rules quoted.

In the same case it was *held* that under the rules described above it was the duty of the engineer, unless he knew that the course adopted by the conductor would bring about a condition of danger, to follow the conductor's orders.

In the same case the plaintiff contended that the head brakeman was negligent because after climbing through the cars on the occupied track he sat down on the next track, which was clear, waiting for the deceased conductor to come back with the engine on the clear track, instead of warning him not to return on the occupied track, and it was *held,* that, assuming that it would have been the duty of the head brakeman to have done what he could to prevent the accident if he had had any reason to foresee it, yet he had no reason to suppose that the deceased conductor would undertake to return with the engine on the occupied track.

In the same case the plaintiff contended that the fireman was negligent because in going into the freight yard on the parallel track he ought to have seen from his side of the cab of the engine that there were cars on the occupied track by which the deceased conductor attempted to return, but it was *held* that it was no part of the duty of the fireman to examine the tracks in order to warn the conductor, who was in charge of the train subject to the orders of the yardmaster, as to which track he ought to take on coming back.

It is not justifiable to found an inference nor an argument upon a palpable verbal slip made by a witness in one of his answers upon his cross-examination.

In the case described above it was *said* that the deceased, although an experienced and careful conductor, neglected his duty four times before the accident that caused his death: first, in not reporting to the yardmaster with his way bills when he delivered the freight cars he had brought, second, in undertaking to use a track in going back with his engine without permission from the yardmaster to do so, third, in failing to examine the track before thus using it without permission to find out whether it was clear, fourth, in having no light on the tender of the engine when backing down and in supplying this lack by standing with his conductor's lantern at the rear end of the tender where he was killed by coming in collision with cars standing on the track; and it was *held* that on the evidence he was the only person who could have been found to be negligent and that the case came within the decision in *Great Northern Railway* v. *Wiles,* 240 U. S. 444.

LORING, J.   This is an action under the federal employers' liability act * brought to recover for the death of a freight con-

---

* 35 U. S. Sts. at Large, c. 149, as amended by U. S. St. 1910, c. 143. The parts of that statute here material are as follows: § 1. "Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, . . ." § 3. "That in all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this act to recover damages

ductor in the defendant's employ. The accident happened in the
Readville transfer yard. The administrator called to the witness
stand the yardmaster of that yard, and the engineer, fireman and
head brakeman of the train. He also put upon the stand a Hyde
Park policeman whose testimony has no bearing on the case.
Upon the conclusion of the plaintiff's evidence, the presiding
judge * ruled that the plaintiff was not entitled to recover and
directed the jury to find a verdict for the defendant and reported
the case for determination by this court.

The facts disclosed by the plaintiff's evidence were as follows:
The Readville transfer yard is a yard some four thousand feet in
length used for the distribution of freight cars. The entrance to
the yard at each end is controlled by an interlocking switch
tower. The tower first reached by a train running east is tower
180, and that at the other-end is tower 234. The yardmaster's
office is situated some twenty-six hundred feet beyond tower 180
and about fourteen hundred feet short of tower 234. At that
point there are eighteen tracks in the yard, seven (not including
a short spur track) in front and eleven behind the yardmaster's
office. The train in question was bound for the South Boston
freight terminal of the defendant railroad, having started from
Midway, a point in Connecticut on or reached by the Providence
division. The Providence division is a two track road until this
yard is reached. A freight train bound for the South Boston
terminal leaves the east bound passenger track of the Providence
division at tower 180 and runs on the main east bound freight
transfer track No. 2 which skirts all the tracks behind the yard-
master's office and farther on connects with one of the tracks of
the Midland division. The tracks of the Midland division cross
the tracks of the Providence division on an overhead bridge at
Readville beyond tower 234. From this it appears (and it was
a fact) that a freight train coming from a point on the Providence
division bound for South Boston freight terminal had to climb a
hill between tower 180 and the connection between the main
freight transfer track and the tracks of the Midland division.

for personal injuries to an employee, or where such injuries have resulted in
his death, the fact that the employee may have been guilty of contributory
negligence shall not bar a recovery, . . ."

    * *White*, J.

The train in question left Providence with thirty loaded freight cars bound for the South Boston freight terminal. Between Providence and tower 180 it had to take up fifteen more. These were bound for the Readville transfer yard to be distributed from there to various stations in the neighborhood.

Under these circumstances the deceased before leaving Providence went to the train dispatcher there and asked him (the train dispatcher) to give him (the deceased) permission on arriving at tower 180 to leave the thirty cars of his train bound for the South Boston freight terminal on the main passenger track while he left the other fifteen cars in the Readville yard. The reason why he did this was because the train of forty-five cars was too heavy a train to haul up "over the hill."

Under these conditions the deceased came to tower 180 at about quarter past ten o'clock at night. At that point he stopped his train; he went into the tower and called up the yardmaster by telephone and said to him: "'I have a heavy train, forty-five cars. I don't think my engine can haul them over the hill,' or 'haul them up track 2.' . . . 'I have obtained permission from the Providence Division Dispatcher to drop my train on the main line if you will allow me to pull into the yard.'" To which the yardmaster said: "'All right Al, I will line up one of the clear tracks in front of the office to pull down and drop your fifteen cars.'" Thereupon the yardmaster examined tracks 10, 8 and 6 which lay directly in front of his office. It was a Sunday night and on Sunday nights the yardmaster had no assistant. He found that tracks 10 and 6 were clear, but that there were some cars on track 8. Thereupon he set the switches for the deceased's train to take track 10. After setting the switch he waited there about two minutes and as the deceased came along with his train "I gave him the hand signal from some point right around 10 switch. . . . It is a 'come on' signal."

On leaving the tower the deceased boarded the engine and as they went forward he said to the engineer, "We will go in on 8 and come out on 10." When the engineer saw that the yardmaster had set the switches for the train to go in on 10, he said to the deceased, "The switches are lined up for track 10," to which the deceased answered, "It don't make any difference, we will go in through 10 and come back through 8."

The deceased stopped his train of fifteen cars so that the middle of it was about opposite the yardmaster's office. It was his duty then to go to the yardmaster and deliver to him the way bills for the fifteen cars which were to be distributed from the Readville yard. On the train stopping opposite his office, the yardmaster went to the rear of this train of fifteen cars, expecting to see the conductor there and to receive from him these way bills. On arriving there he did not find the conductor. Thereupon he returned to his office.

When the fifteen cars had been brought to a standstill, the conductor got down from the engine and cut them off. He then boarded the engine again and rode on it to the other end of track 10. When the engine reached this point he again got down and went to No. 8 switch and set that switch so that the engine could come back on track 8. While he was doing this, the engine went on to the "water plug," which was farther on toward tower 234, and he waited for the engine to come back. When the engine had taken water it came back to No. 8 switch and the deceased then boarded the engine. The engineer said to him, "there is no light on the rear end of that tender." By the rules of the road no engine can back down without a light on the tender. Thereupon the conductor boarded the rear end of the tender and stood there with his conductor's lantern while the engine backed down on track 8 until they came into collision with the cars upon that track which were some two hundred and fifty feet in from the switch. When the engine came into collision with these cars, the front ones (which were flat cars) rose up over the tender and struck the deceased. He was immediately carried to the Readville station, but died before he arrived there.

1. The first contention made by the plaintiff is founded upon the fact that the deceased told the engineer when they were on the engine after leaving tower 180 that they were to go in on track 8 and come out on track 10, and that when the engineer, seeing that the switch had been set for the train to go in on track 10, told the deceased that, he said, "It don't make any difference, we will go in through 10 and come back through 8." From the fact that the deceased made these statements to the engineer, the plaintiff contends that the jury were warranted in finding that in the course of the conversation which the deceased had with the yardmaster

over the telephone while the deceased was in tower 180 the yard-master had told the deceased to go in on track 8 and come out on track 10. In support of this contention the plaintiff has relied upon the case of *Nagle* v. *Boston & Northern Street Railway*, 188 Mass. 38. But that decision does not support this contention. In *Nagle* v. *Boston & Northern Street Railway* what the deceased said was that the car starter had told him to take the track which he took. If the engineer had testified that what the deceased said to him was that the yardmaster had told him to go in on track 8 and come out on track 10, the case at bar would have come within the decision in *Nagle* v. *Boston & Northern Street Railway*. But in the case at bar the engineer did not testify that the deceased told him that the yardmaster directed him (the deceased) to go in on track 8 and come out on track 10. Of course the jury could disbelieve the testimony of the yardmaster although he was put on the witness stand by the plaintiff, if there was any evidence to contradict him. But there was none. The fact that the deceased said that he was going to take a certain course after he had the conversation with the yardmaster is not evidence that the yardmaster told him to take that course of action.

So far as the direct testimony goes, the yardmaster told him that he would "line up" a track for him without telling him what track he would "line up," intending to find out what tracks were clear and then "line up" one of them for the deceased.

2. The plaintiff's second contention is that the jury were warranted in finding that the yardmaster was negligent because he returned to his office to attend to his duties when he failed to find the conductor at the rear end of the fifteen cars. His contention is that when he found that the conductor was not at the end of the fifteen cars he ought to have gone out into the yard, found him and told him what track to come back on. But the jury were not warranted in making that finding. The yardmaster's duty was at his office. He was not only the yardmaster of this yard but of five others. He did not know what call would come to him next. It was his duty to be at his office or in that immediate neighborhood so as to respond to any call as to the conduct of the yards under his control. More than that he had no reason to suppose that the deceased would undertake to use any track in the yard without getting permission from him to do so. Under

the rules of the company the deceased had no right to use a track in the yard without permission from the yardmaster. And lastly, it was the duty of the conductor to bring the way bills (which showed where the fifteen cars to be left in the yard were to be sent to) to the yardmaster, and it was the duty of the yard-master to remain at his office to receive them.

The difficulty with the plaintiff's argument is that in this instance, and throughout his whole argument, he asks the court to judge of the character of the action of the defendant's employees in the light of what transpired afterwards, and not in the light of the conditions which confronted the employees at the time they took the action which the plaintiff complains of. It goes as a matter of course that if the yardmaster had known what the deceased was going to do he ought to have taken means to stop it. But the yardmaster had no reason to suppose that the deceased would do what he did in fact do. It was his duty (as we have said before) to remain at his office to answer any calls which might come to him for the conduct of this and the other yards. There is nothing in the cases cited by the plaintiff in this connection, (*Grant* v. *Union Pacific Railway*, 45 Fed. Rep. 673, 680; *Evans* v. *Detroit G. H. & M. Railway*, 148 N. W. Rep. 490; *Texas & New Orleans Railway* v. *Tatman*, 10 Tex. Civ. App. 434, 435,) which helps him.

3. The answer to the next contention made by the plaintiff has already been given. That contention is that, when the yardmaster on going to the rear end of the fifteen cars did not find the deceased, the jury were warranted in finding that he ought to have telephoned to tower 234 and told the tower man to tell the deceased through the megaphone not to come back on track 8. The conclusive answer, as we have already intimated, is that the yard-master had no reason to suppose that the deceased would undertake to come back on track 8. An additional answer (if one were necessary) was given by the yardmaster in his testimony, namely, that it is bad railroading to send orders through a third person, and not only that, but through a third person who has to speak through a megaphone to deliver the order to be transmitted by him.

4. The next contention made by the plaintiff is that the yard-master ought to have warned the deceased that there were cars on track 8 when he first spoke to him over the telephone while

the deceased was in tower 180. But that would have been bad railroading, as the yardmaster testified. It was not proper for him to tell him to use a particular track until he found by actual inspection that the track was clear. That was the course pursued by the yardmaster. He gave permission to the deceased to come into the yard and told him that he would "line up" a track for him to use. Thereupon he left his office. He examined the tracks which were lying in front of it. He found that 10 and 6 were clear and 8 was blocked. Thereupon he set the switch for 10 and signalled the deceased to come in on 10. Under the course of action properly adopted by the yardmaster, it was the duty of the deceased to come to him to ascertain what track he was to use in going out.

5. The next contention of the plaintiff is that the engineer was equally culpable with the deceased conductor under the rules. The plaintiff's contention here is that the rules make the engineer equally responsible with the conductor for the safety and proper handling of the train. This contention is based upon rule 544. That rule provides: "Make the safety of the train of the first importance in the discharge of their duties. Should there be any doubt as to the right of road, or safety of proceeding, from any cause, consult with the conductor and be equally responsible with him for the safety and proper handling of the train, and for such use of signals and other precautions as the case may require." That rule must be read in connection with Rules 500 and 615. So far as material, Rules 500 and 615 are as follows: "Rule 500 . . . 'Engine Men. On the road, obey orders of the conductor as to starting, stopping, shifting cars; as to general management of the train, unless such orders endanger the safety of the train or would require a violation of the rules or cause injury to persons or to property.'" "Rule 615. 'Conductors. Be responsible for all switching movements.'"

6. The plaintiff's next contention is that the engineer was negligent because while he was backing down on track 8 he testified he was leaning out of his cab and looking at that track and he ought to have seen the cars. The engineer testified that he was watching in that direction, and it was his duty as much as the conductor's to see that his engine got out safely. When asked this question, "And although you were looking in that direction, and

had nothing else to do but look and run your engine, you did not make that observation to see whether the track was clear or not?" he answered, "I was looking to see if it was clear, certainly; I was watching the conductor." He then was asked this question: "And if a man looked properly in the direction in which you were looking, he ought to have seen obstructions, if they were there?" to which he answered, "Why yes; a man on the rear end of the tender had." This answer taken in connection with the rules of the railroad disposes of this contention. It was the duty of the engineer unless he knew that the action of the conductor brought about a condition of danger, to follow the conductor's orders. This engineer knew that he had been ordered by the conductor to back down on track 8. He knew that his conductor was standing on the rear tender. Under these circumstances there was no duty upon him to make certain that track 8 was clear and the jury were not warranted in finding that he was negligent because he did not see the cars upon track 8.

7. The next contention of the plaintiff is that the head brakeman was negligent. The head brakeman testified that after he had set the brakes on four or five of the fifteen cars which were left on track 10, he climbed through the cars on track 8 and sat down on track 6 expecting the engine to come back on that track. If the head brakeman had known that the deceased was going to undertake to come back on track 8, it may be assumed that it would have been his duty to have done what he could to prevent the accident. But he had no reason to suppose that the deceased would undertake to do that. Under these circumstances he had no duty to perform to prevent the accident, and the jury were not warranted in finding that he was negligent in sitting down on track 6 and waiting for the engine to come back.

8. The last contention of the plaintiff is that the fireman was negligent. This contention is based upon the fact that track 8 was on the fireman's side of the cab and the fireman ought to have seen that there were cars on track 8 when they went through on track 10, and it was negligent for him not to have seen them and to have told the engineer not to go back on track 8. Here again it was no part of the duty of the fireman to examine the tracks to warn the deceased as to which track he ought to take on coming back from track 10. The deceased was the conductor and was in charge of

the train subject to the orders of the yardmaster. The jury were not warranted in finding that the fireman was negligent because he did not undertake to superintend the proper execution by the conductor and the yardmaster of their respective duties.

9. The plaintiff has relied upon the fact that the yardmaster made a slip in his direct testimony, in that there is an unfinished sentence in his testimony on cross-examination and upon the fact that on the evidence the jury could find that the deceased was an experienced and careful conductor. In describing on his direct testimony what he did after he had the conversation with the deceased while the deceased was in tower 180, the yardmaster said "he climbed through the cars on 8 and did the same thing to 6; found 6, 8 and 10 were clear." The statement that track 8 was clear, following within nine words the statement that "he climbed through the cars on 8" was so plainly a slip that no inference against the testimony of the witness was justified. The unfinished sentence on cross-examination was this: the counsel for the defendant asked the witness, "That [referring to setting the switch for track 10] would tell the conductor who was approaching that everything was clear, would it not?" To this the yardmaster answered "The conductor could tell by looking at the switches, but as I told him — I don't know as I told him, but I made a hand signal, — the engineer knew everything was all right." From this the plaintiff argues that the jury were warranted in finding that the yardmaster had told the conductor that everything was clear, including in everything track 8. In our opinion the inference is not warranted.

The fact that the deceased was an experienced and careful conductor, taken in connection with the fact that on leaving the tower he said that he was going in on track 8 and coming out on track 10, would not warrant the inference that the yardmaster told him to do so.

10. Why the deceased, although an experienced and careful conductor, neglected his duty at the Readville transfer yard four times on the night in question is a matter of conjecture. That he did neglect his duty on that night in four particulars, is the fact. He neglected his duty in not reporting to the yardmaster with his way bills when he had brought his fifteen cars to a stop on track 10 in front of the yardmaster's office; in place of doing that

he rode down on the engine to the switch on the end of track 8. He neglected his duty in the second place in undertaking to use track 8 without permission from the yardmaster. In the third place, if he was undertaking to use track 8 without permission · from the yardmaster at his own risk, at least he should have examined the track he intended to use without permission to make sure it was clear. And in the fourth place, as the engine was backing down on track 8 he was standing at the rear end of the tender to show a light for the tender, and he stood there until he was killed by coming in collision with the cars on track 8. It is a fact that he had left his thirty cars on the east bound passenger track of the Providence division with a New York fast express only thirty minutes behind him; it is also a fact that he had induced the officer at Midway to make up the train and send him off at three o'clock, when the regular leaving time of the train was forty minutes past four. From these two facts it seems to be likely that the deceased was in a hurry. Whether his hurry explains his neglect of duty and the accident, is a matter of conjecture.

On the evidence the only person who was negligent was the deceased and the judge was right in directing a verdict for the defendant. The case comes within *Great Northern Railway* v. *Wiles,* 240 U. S. 444. There is nothing in the cases cited by the plaintiff which requires special notice. The entry must be

*Judgment on the verdict.*

*James J. McCarthy,* (*D. M. Lyons* with him,) for the plaintiff.
*J. L. Hall,* for the defendant.