The negligence charged in the first count was that it was the duty of the defendants to furnish Armstrong a reasonably safe place to work in, but they negligently permitted certain unlighted freight cars to be in close and dangerous proximity to the lead or running track on which he was working, and the accident happend as the result. The second count was like the first, except that instead of relying only on the alleged duty of both defendants to furnish a reasonably safe place to work, it alleged that the Chicago and Western Indiana Railroad Company (hereafter called the Indiana Company) allowed certain unlighted cars to stand on its track, making it unsafe, and that the Chicago and Eastern Illinois Railway Company (hereafter called the Illinois Company) failed to furnish a clear track by permitting cars to be on the track. The third count was like the first, except that it alleged that the Indiana Company owned and used the yard in question for storage purposes; that cars in the yard, if not braked, would roll down-hill, fouling the running track; that these facts were not known or appreciated by Armstrong; that the yard was unlighted; that the Indiana Company permitted cars to stand on tracks without the brakes being set; that by reason of the negligence of the Indiana Company the cars rolled down-hill and fouled the running track; that the Indiana Company permitted and signaled Armstrong to use the running track; that the Illinois Company negligently required Armstrong to move cars upon the running track and over an unlighted yard without taking any reasonable precaution to render the track safe; that while riding on the end car *Page 435 
Armstrong came in contact with the cars which were obstructing the running track and therefrom received the injuries resulting in his death.
The pleas were the general issue and special pleas denying ownership and operation, alleging that the accident was caused by the sole negligence of Armstrong and that he assumed the risk. All the testimony heard was given by the witnesses of the plaintiff called by her. At the close of her evidence the defendants jointly, and each severally, moved for a directed verdict of not guilty, and the motions were overruled. No witness was called and no evidence was offered on behalf of the defendants and the jury found both defendants guilty. Error was assigned by the defendants on the denial of the motions for a directed verdict.
The evidence showed that Armstrong was conductor on a freight train, and had been in the employ of the Illinois Company about eight years and had been working for two years, with the exception of three months, on the same run, with the same crew, making the same deliveries to the same yards at night, and was therefore familiar with the duties of the run and the methods of performing them and the places in which they were to be performed. On the night of August 14, 1928, the train was engaged in interstate traffic. Miller was engineer, Evers the fireman, Hornaday the front or head brakeman, Gibbons the rear brakeman or flagman, and Armstrong was in charge of the crew. The crew reported for duty at about 11:30 on that night at Yard Center, which is one mile south of Dolton, Illinois. Their train consisted of engine No. 1802, which was a terminal engine, and thirty-five cars, with a caboose attached. The engine was capable of handling one hundred cars in the ordinary way. Armstrong was in control of the operation of the train and members of the crew got their orders from him. Proceeding from Yard Center the train was run north to Oakdale, where seven of the thirty-five cars were set out. The train was then run north to *Page 436 
deliver twelve cars at the Eighty-third street yard. To deliver the cars there it was necessary to go north on No. 4 freight main track to Eightieth street, then northeasterly on Belt track No. 2 until the rear of the train cleared the inter-locker plant at Eightieth street, then to back into the yard from the north. The interlocking plant was operated and maintained by the Indiana Company. After the train was run past the interlocking plant, signals were given to the crew to back into the yard on the running track. Gibbons had jumped off before the train was run into the yard at Eighty-ninth street in the regular course of the movement, to line the switches and protect the train while in the yard. He had no further part in the events which followed. The train was backed in, and the sixteen cars and caboose which were not to be left in the yard were detached and left on the running track, south of the yard lead track switch. The twelve cars which were to be delivered in the yard were thus left attached to the engine. The train of engine and twelve cars was then moved north past the yard lead switch. Hornaday then set the yard lead switch and signaled the engineer to proceed south. The train was then backed southeast on the yard lead track. Armstrong set the switch to track No. 8 and signaled indirectly, through Hornaday, for the engineer to back the train in on that track. Armstrong stood clear of track No. 8. The train was being backed southeast on track No. 8 at about two to four miles an hour, when there was an impact indicating that it had struck standing cars. The engineer did not stop and Armstrong signaled the engineer to continue backing. He did so, backing about four car lengths and the length of the engine additional, and eventually bringing the front end of his engine about thirty feet south of the switch on track No. 8 and there stopping on signal from Armstrong. Hornaday then, in response to a signal from Armstrong, cut off the twelve cars from the engine and Armstrong signaled the engineer to proceed *Page 437 
north. The engineer did so, and after going north past the lead switch into the running track backed his engine south again on that track and it was attached to the sixteen cars and caboose which had been left on that track. Armstrong was standing at track No. 8, about opposite the caboose at the south end of the string of sixteen cars standing on the running track, and he walked west across to the caboose and got on it. The air was attached and Armstrong signaled the engineer to back south on the running track. It was the duty of Armstrong to keep a watch for other trains, cars or obstructions as the train was backed, and he could apply the air-brakes from either end of the caboose and bring the train to a stop. He was the only person on the caboose. Hornaday was riding on top of the car next the engine. The engineer backed the train south along the running track and was proceeding at about ten or twelve miles an hour when there was an impact, and he applied the brakes and stopped the train. No signal had been given him nor had the brakes been applied from the caboose. The south end of track No. 8 was connected by means of a lead track with the running track under a viaduct, under which was a green light at each end, indicating that the running track was clear. The impact had come when the caboose was under the viaduct. A string of fifty-six cars, all coupled together, had come down from track No. 8 so far that the south car of the string was entirely on the running track, the next car was about half-way on, and the caboose had struck the latter car about its middle, thus causing the impact and so injuring Armstrong that he was unconscious a moment after the engineer reached him and died shortly afterward in the Englewood Hospital.
The accident occurred at about 3:10 A. M., August 15, 1928. The yard and tracks sloped slightly to the south at the south end, but not to such an extent that cars placed on the tracks would get in motion of their own weight. Whether brakes had been set on the string of fifty-six cars *Page 438 
on track No. 8 or not was not shown. There was a distance of about four car lengths between the string of fifty-six cars and the twelve cars which Armstrong had set on track No. 8. The yard was in charge of no one at night except the switch-tender who let the train into the yard at Eightieth street. Armstrong selected track No. 8 as the track on which to set the twelve cars, and caused them to be set there without investigation of the number of cars already on that track or the result of the impact of the train of twelve cars and heavy engine against them. These facts are all shown by the testimony of the engineer, Miller, a witness for the plaintiff. They showed that the place where the members of this train crew were to work under the viaduct was unsafe but that it had been made unsafe by Armstrong. The space of four car lengths between the string of fifty-six cars and the string of twelve cars showed that the string of fifty-six cars had been moved the distance of four car lengths, plus the length of the engine and about four car lengths which Armstrong's train had moved in obedience to his direction after the impact. The running track where it passed under the viaduct had not been obstructed long enough to charge the Indiana Company with notice of its condition. Armstrong created the dangerous condition which proved fatal to him.
The defendant in error contends that some of Miller's testimony was obviously untrue. Miller was the defendant in error's witness and the case rests largely on his testimony. This contention of the defendant in error is open, first, to the criticism that it comes with ill-grace from the defendant in error to urge that Miller should be believed where his testimony has aided her case but should be disbelieved where it has had a contrary effect. There is no doubt about the rule of law that a party to a lawsuit is not bound by the testimony of witnesses whom he has called but may show the truth by any competent testimony, even in direct contradiction of what such witnesses have testified. *Page 439 
The party, however, may not impeach his own witness, whom he has voluntarily called, by proving contradictory statements, or by the claim that the witness is generally unworthy of belief, and he cannot prove such statements either as independent evidence or for the purpose of impeaching the witness. (Chicago City Railway Co. v. Gregory, 221 Ill. 591.) There is nothing inherently improbable or contrary to the laws of nature in Miller's testimony and no evidence in contradiction of his testimony. The fact, if that fact appeared from the record, that he may have been impeached by inconsistencies in his testimony or contradictory statements will not supply the lack of proof of the plaintiff's case. A party who calls even his adversary as a witness cannot call in question his credibility. That part of the witness' testimony which made in favor of the plaintiffs in error must be considered as well as that part, if any, making against them and must be taken as true if there is no countervailing testimony. Luthy Co. v. Paradis, 299 Ill. 380; Sawyer v. Moyer, 109 id. 461; Bowman v. Ash, 143 id. 649;American Hoist and Derrick Co. v. Hall, 208 id. 597.
The defendant in error was erroneously permitted to examine the witnesses in regard to some minor variances from Miller's testimony before the coroner. But upon the essential facts as we have stated them, Miller's testimony is uncontradicted, and, of course, unimpeached, for the defendant in error could not impeach her own witness. The defendant in error considers that Miller's story is not entirely correct, for track No. 8, as it was admitted, holds only sixty-two cars, and Miller's testimony, it is contended, shows that it held the twelve cars delivered by the Illinois Company, space for four cars and all but two of the fifty-six cars which had been standing on that track. This disregards the fact that track No. 8 did not connect directly with the running track under the viaduct but was connected by means of the lead track, and therefore the cars *Page 440 
from track No. 8 had to pass over the lead track to reach the running track. This fact the defendant in error did not consider and the length of the lead track was not shown in evidence. The impact of the twelve cars and engine with the cars standing on track No. 8 was slight, and the defendant in error argues that probably Armstrong did not know that it had occurred, and consequently when he signaled to Miller to continue backing he was not negligent but that Miller was negligent in not informing Armstrong of the impact. The argument is of no force, for Miller had no reason to suppose that Armstrong did not know of the impact or did not know what cars were on track No. 8 and the extent of the obstruction there. It was Armstrong's duty, alone, to ascertain if there was room on the track to take care of the cars and to walk as far as was necessary to ascertain that fact. It is also argued that the impact was so slight it could not have driven the fifty-six cars the distance they were driven, but this argument ignores the fact that it was not only the impact which set the cars in motion, but there was also the continued exertion of the pushing power of the engine capable of handling one hundred cars. Armstrong was in control of the crew and by his order caused the engineer, his subordinate, to push the twelve cars upon track No. 8 without knowing what stood in the way.
The defendant in error contends that if the brakes had been set on the fifty-six cars which stood on track No. 8 they would not have been jarred into motion by the impact and caused to go out upon the running track. There is no evidence on this point. The cars were set in motion and there is no evidence that they were not braked.
Counsel for the defendant in error contend that it was negligence not to have a night yardmaster on duty at the yard and not to have had the brakes set on the cars standing on track No. 8. In addition to Miller three other witnesses testified in regard to the Eighty-third street yard and various practices there. F.C. Schnackenberg, chief clerk *Page 441 
of the general superintendent of the Indiana Company, testified that the yard was a gravity yard, sloping slightly to the south at its south end; that no orders had ever been issued that cars placed there should be anchored or braked; that of the storage tracks in the yard, which are numbered from 5 to 23, tracks Nos. 10 and 11 are the customary delivery tracks for foreign cars brought in; that during the day there is a yardmaster on duty, who issues orders to foreign crews where to place cars if they are not placed on the customary delivery tracks; that there is no yard-master on duty at night; that there is a switch-tender in a shanty on duty at night at the interlocking plant or switch at Eightieth street; that the interlocking plant or switch is not a standard interlocking plant but switches; that the switch-tender does not operate the switches in the yard; that there is no one in the yards at night to tell foreign conductors where to place cars; that foreign conductors could use their own discretion in that respect if tracks Nos. 10 and 11 were filled; that the switch-tender had nothing at all to do with the delivery track that they set out the cars on; that that was solely the duty and responsibility of the foreign conductor; that such was the uniform custom and practice, and it was not the uniform custom and practice to brake or anchor all cars placed on these tracks; that it was the custom to have cars unbraked, for the grade was not great enough to cause cars of their own momentum to roll down and foul the tracks after they are once stopped; that if they are jolted after being stopped it depends upon how hard the jolt is as to whether it will start a movement; that it would be improbable that cars with brakes set, when moved at a speed of two to four miles an hour, would have rolled down far enough to have fouled the running track.
Theodore Lockwood, who worked as switchman and conductor for the Indiana Company for four years, including the month of the accident, testified that there were *Page 442 
orders from the superintendent to put brakes on all cars which were set in that yard, and it was the custom to put brakes on all cars set there because of the grade of the tracks; that bulletins were posted at Fifty-first street, over the superinendent's signature, requiring that cars set there be braked; that at times he worked for other roads and set cars in that yard and at such times received instructions from the yardmaster there where to place the cars; that if the yardmaster was not present he got his instructions sometimes from a clerk there or the switch-tender, but he always got instructions from someone; that he never delivered cars there at night; that no particular tracks were known as delivery tracks, and that he had been in the yard at night but only on a work train.
Clarence J. Hochstadter testified that he was employed by the Illinois Company for seven years ending December 10, 1927, and during that time frequently delivered cars to this yard. Over objections that the time was too remote, made by the plaintiffs in error, he testified that in delivering cars there he always received instructions as to where to place them — at night from the switch-tender at his shanty; that he always blocked and braked cars which he placed in the yard and that it was the custom to do so.
The testimony of Lockwood tends to show that there were orders of the superintendent to brake all cars set in this yard and that it was customary to put brakes on all cars set in the yard. The testimony in regard to his own experience and conduct in setting cars in that yard, that he had set cars in that yard and that he received instructions from the yardmaster where to place them, and if the yardmaster was not there sometimes from the clerk or the switch-tender, but he always got instructions from someone, is not important, because he never delivered cars there at night. Hochstadter testified that he was employed by the Illinois Company for seven years ending December 10, 1927, and during that time frequently delivered cars to the yard. *Page 443 
Over objection that the time was too remote, he testified that in delivering cars there he always received directions where to place them at night time from the switch-tender at the shanty. He always blocked and braked cars which he placed in the yard. It was the custom to do so. This testimony also tends to show a custom to brake the cars, but it does not tend to show any authority of the switch-tender over the yard other than to throw the switch. It referred to a time months before the time of the occurrence in question here and related to the witness alone. It is apparent that evidence of a former custom is not contradictory of evidence showing that no such custom existed at a later specific date, and the evidence is also uncontradicted that at the time this accident happened the switch-tender had nothing at all to do with the delivery track on which the cars were to be set out.
There is no evidence that it was negligence for the Indiana Company not to have a yardmaster in the unlighted yard to direct the placing of cars as they came in. Under a yardmaster familiar with the use of the various tracks at the moment, less time might be consumed in selecting a track to accommodate a line of cars than if the selection were left to the foreign conductor bringing them in for delivery, but the foreign conductor, by making the necessary investigation, even in an unlighted yard, could determine upon what track he could safely set his cars, and that was all that was necessary. The place could be selected more quickly by one familiar with the present occupation of the various tracks, but it could be done safely by another. The question is one of safety — not rapidity of action — and is to be determined by those charged with the responsibility of their action, provided the manner selected is reasonably safe, and not by the verdict of a jury.
Neither is there any evidence that the cars were not braked. The testimony of Schnackenberg that it was improbable that cars with brakes set would have rolled down *Page 444 
far enough to foul the running track was not evidence that brakes were not set on the cars. It was a mere opinion of the witness, not entitled to be given weight as any evidence of the fact, and not upon a question which was the subject of expert or opinion evidence. The case must be decided by the jury on evidence of the facts and not on the opinions of the witnesses.
All the evidence in this case was produced by the defendant in error. It showed, without contradiction, that Armstrong went into this Eighty-third street railway yard, and it was his duty, if tracks Nos. 10 and 11 were not filled, to put his cars on one of those tracks. If they were filled, so that it became necessary to use another track, it was his duty to ascertain that such other track had room enough to take care of the cars he wanted to place on it. This was his duty alone. If there was a custom to have all cars braked which were placed on this track in the yard it was Armstrong's duty to see that this was done, and it was his duty, before putting his cars on any track, to make sure that the track had room enough to take care of the cars. He was in absolute control of the crew, and if it was necessary, in order to ascertain the fact, to walk to the south end of the yard it was his duty to do that. He did not do this, and when he ascertained certainly by the bump of the cars that there was an obstruction on track No. 8, it was his duty to ascertain its nature and the extent of the obstruction. He did not do so, and in consequence, when the engine was switched to the running track and attached to the sixteen cars and caboose and backed down the running track, it collided with the cars which had been pushed along track No. 8 and the lead track out upon the running track. This was solely the result of Armstrong's failure to ascertain that there was room on track No. 8 for the twelve cars he wanted to place and was not the result of the negligence of either of the defendants or of any servant of either of them other than Armstrong. The case was not *Page 445 
one of contributory negligence but of negligence which was the sole cause of the accident, and the court should have instructed the jury to find a verdict for the defendants.Great Northern Railway Co. v. Wales, 240 U.S. 444; Freese v.Chicago, Burlington and Quincy Railroad Co. 263 id. 1; Davis v.Kennedy, 266 id. 147; Gillis v. New York, New Haven and HudsonRiver Railroad Co. 224 Mass. 541; Ingram v. Atlantic Coast LineRailroad Co. 181 N.C. 491.
Mr. JUSTICE DEYOUNG concurs in this dissenting opinion.