ANNA MABEL SWEAT, ADMINISTRATRIX, APPELLEE, V. WALKER D. HINES, DIRECTOR GENERAL OF RAILROADS, APPELLANT.

FILED OCTOBER 14, 1921. NO. 21677.

1. **Master and Servant:** ACTION FOR DEATH: NEGLIGENCE. Where, in an action for damages for the death of plaintiff's decedent against the director general of railroads, instituted under the federal employers' liability act, arising out of an alleged violation of the federal safety appliance act, it appears from the undisputed testimony that, while in transit, the automatic coupler to one of the defendant's cars become broken and discarded as unfit for further use, and instead of conveying said "bad-order" car to the nearest point for repair, as required under the statute, the defendant caused said car to be fastened to the car behind it by means of a chain, and, thus fastened, mingled said "bad-order" car with other commercial cars and proceeded to haul it toward its destination at a distant point in a neighboring state, *held*, said act on the part of the defendant to be negligence *per se*.

2. ———: ———: QUESTION FOR JURY: SUFFICIENCY OF EVIDENCE: ASSUMPTION OF RISK. On the claim by defendant that decedent, in being where he was and in doing what he did at the time of the happening of the accident, resulting in his death, was a mere volunteer, and not engaged in the master's service, and that it was the duty of the court to so declare as a matter of law and direct a verdict for the defendant accordingly, *held*, that under the evidence the question was one of fact properly to be submitted to the jury. This having been done, under a proper instruction, and a verdict favorable to the plaintiff returned, *held*, further, that the evidence is ample to support a finding for plaintiff in this respect; *held*, further, that, if decedent was properly

(1)

engaged in the master's service at the time and place of the accident, he did not assume the risk of danger incurred thereby, even though he had full prior knowledge of the same.

3. ——: ——: MEASURE OF DAMAGES. In an action for damages against the director general of railroads for the death of plaintiff's decedent, instituted in a state court under the federal employers' liability act, upon a finding for plaintiff, the measure of damages must be settled according to the principles of law as administered by the federal courts requiring the ascertained proceeds of the probable future earnings of decedent to be reduced to their present worth and to include in the verdict to be returned by the jury such sum only, and it is the duty of the state court to so instruct the jury. The defendant having tendered such instruction to the trial court, and the same being refused, and the court giving no other instruction upon the subject, *held* error.

4. ——: ——: EXCESSIVE DAMAGES. In view of the foregoing and in connection therewith, *held*, further, that the verdict and the judgment rendered thereon is grossly excessive, because of which a new trial must be granted.

APPEAL from the district court for Dawes county: WILLIAM H. WESTOVER, JUDGE. *Reversed.*

*Wymer Dressler, Robert D. Neely* and *Paul S. Topping,* for appellant.

*M. F. Harrington* and *Gerald F. Harrington, contra.*

Heard before MORRISSEY, C.J., ROSE, ALDRICH and FLANSBURG, JJ., DICKSON and TROUP, District Judges.

TROUP, District Judge.

This is an action for damages against Walker D. Hines, as director general of railroads, brought by Anna Mabel Sweat, the administratrix of the estate of her deceased husband, who at the time of the accident, resulting in his death, was a freight conductor in the employ of the defendant. The action is brought under the federal employers' liability act (U. S. Comp. St. 1918, secs. 8657-8665) and involves the alleged violation of the federal safety appliance act (U. S. Comp. St. 1918, secs. 8605-8650).

The plaintiff's petition contains the usual allegations necessary to maintain the action and prays for a judgment in the sum of $100,000. The defendant admits the death of deceased at the time and place alleged, and that at the time of the accident resulting in his death he was a conductor in the general employment of the defendant, but alleges that at the time and place of the accident the deceased was a mere licensee and volunteer, that any defects which may have existed in the equipment of defendant's car were open and obvious and well known to deceased at the time, and that by reason thereof he assumed the risk of any injury arising therefrom, and denies all other allegations of plaintiff's petition, and all liability for the death of decedent, and prays a dismissal of the action. The reply denies all new matter in defendant's answer.

A trial of the case to a court and jury resulted in a verdict of $55,000. Upon motion by defendant for a new trial the court required as a condition precedent to the denial thereof a remittitur by plaintiff of $15,000 from the verdict, to which plaintiff agreed, and thereupon motion for new trial was overruled, and a judgment rendered for the plaintiff in the sum of $40,000 and costs. The defendant appeals.

The following facts may be regarded as either admitted in the record or established by the undisputed evidence: On the 27th of September, 1919, one Sprague, in the employ of the defendant, was conducting a freight train from Lusk, in the state of Wyoming, to Chadron, in the state of Nebraska. When this train reached a point near Dakota Junction, Nebraska, about 4 miles west of Chadron, the draw-bar at the west end of a car loaded with coal pulled out; the same was taken and thrown to one side on the right of way, and the coal car, thenceforth known as the "bad-order" car, was coupled to the car next in the rear, the same being a flat car loaded with lumber, by means of a chain. Apparently these two cars, the coal or "bad-order" car, and the lumber car to which it was at-

tached, were not to go to Chadron, but were destined to
some point north from Dakota Junction on the Black Hills
line in South Dakota. Conductor Sprague left the coal
and lumber cars at Dakota Junction and came into Chad-
ron and reported to the train dispatcher at Chadron the
existence and condition of the "bad-order" car at Dakota
Junction. Chadron was the nearest repair shop to Da-
kota Junction where the defective coupler could be re-
paired. On the next morning, September 28, one Gale, a
freight conductor in the employ of defendant, was ordered
from Chadron with a caboose and two engines to proceed
to Dakota Junction, there "pick up his train" and pro-
ceed northward. In the course of making up this train
and in moving or switching the "bad-order" car, the chain
coupler thereon broke and was again repaired by another
chain. It appears that Conductor Gale received no ex-
press orders respecting the "bad-order" car, nevertheless
he included the same in his train, assigning it a place just
next forward from the lumber car, and being the second
car forward from the caboose, and, thus situated, fastened
by a chain to the lumber car in its rear, the train pro-
ceeded northward as far as Smithwick, South Dakota, ar-
riving there about 10:20 in the forenoon.

In the meantime the decedent, as freight conductor, was
engaged in conducting a south-bound freight train from
Deadwood, South Dakota, destined to Chadron, Nebraska,
and arrived at Smithwick, South Dakota, at 10:10 in the
forenoon of the 28th, where he had an order to await the
coming of the north-bound train, which arrived ten min-
utes later; so that at all the times herein mentioned the
defendant and the two conductors of both the north and
south-bound trains were engaged in the traffic of inter-
state commerce. As the north-bound train pulled in on
its track, the decedent and one of his brakemen stood by
on the east side of the moving train, and as the "bad-
order" car passed them their attention was attracted to
the chain coupling between the coal and lumber cars, and
they both immediately proceeded to walk northward the

short distance to where the "bad-order" car had stopped. At or about the same time the conductor of the north-bound train appeared on the opposite or west side of the chain coupling of the "bad order" car, and, for the purpose of inspecting the chain coupling or to readjust the same, or both, both conductors about simultaneously stepped in between the cars from their respective sides, and were there but about a half minute when the engineer of the north-bound train, for the purpose of placing his engine opposite the water tank, a few feet in the rear, to take water, without an order to do so, but, of course, without any knowledge that the conductors were between the cars, suddenly backed up the train, and, there being nothing to prevent the "bad-order" car from coming into immediate contact with the lumber car in the rear, it did so, and both conductors were instantly crushed to death.

In addition to these undisputed facts it must be conceded that the defendant had no lawful right to haul this "bad-order" car as it did, commingled as it was with other commercial cars. It was its duty under the statute, after discovering its defective condition, to take it at once to the nearest repair shop, which was Chadron, four miles east of Dakota Junction, where the defect occurred; but, in the event of hauling it at all, it was the duty of the defendant under the rule governing such a situation to have placed the "bad-order" car at the rear of the caboose. And, had the defendant done either, this accident could not have occurred. So that the defendant, in dealing with this "bad-order" car as it did, was guilty of negligence *per se.* And, further, if the two conductors were rightfully between the cars in pursuance of a duty to the defendant under their employment, they did not assume the risk of the danger incurred in so doing, even though they had full prior knowledge (which, of course, they had) of the defective coupling. So that the liability or non-liability of the defendant in this case depends upon the one question: Was Conductor Sweat, the deceased, justified in going between the cars at the time and under the cir-

cumstances he did, and in pursuance of a duty or obligation devolving upon him, arising out of his general course of employment with the defendant?

The defendant urgently insists that he was not, that he had his own train to look after, and that he was not called upon nor had he any business to meddle with the operation of another man's train, and that in so doing he was a pure volunteer, by reason of which no recovery can be had for the injury incurred.

The defendant itself promulgated a book of rules prescribing the duties and obligations of its various employees in the course of their employment, and distributed the same generally among its employees, one of which was furnished the deceased and was in his possession when he met his death, and from which the following was introduced in evidence:

"1152. In cases of accident to trains, storms, or other causes which may prevent the movement of trains, they will render all possible assistance in restoring normal conditions, whether coming under their particular duties or otherwise, and co-operate with other departments in the protection of the company's property."

A number of the employees of defendant in giving evidence in behalf of the plaintiff were permitted to testify, over the objection of defendant, that it was likewise the custom and practice of defendant's employees generally, when present, to assist each other in every way possible, particularly in the way of promoting traffic in the movement of trains, irrespective of whether they were of the same crew, or in the same department of service. The defendant objected to the admission of such testimony without first requiring the plaintiff to show, if she could, that the defendant had knowledge of such custom. If the rule itself did not furnish a sufficient basis for a finding of defendant's liability, providing the deceased was rightfully within its provisons, then it might have been held error for the court to have received evidence of a custom of employees without first showing that the defendant had

knowledge of the same, and in some manner expressly or impliedly sanctioned it. But if the rule itself, with the record stripped of all evidence of custom, is sufficient for the purpose stated, which we think it is, then the receipt of evidence that it was the custom or practice of employees to observe the rule by complying with its provisions, which is manifestly all the evidence amounts to, would at most be error without prejudice. So that the only question still is: Was the deceased justified in such a measure in doing what he did and being where he was, when the accident occurred, as to render the defendant liable for his death?

Donald Snyder, one of Conductor Sweat's brakemen, was the only eye-witness to the accident, present at the trial and testifying. Snyder and Conductor Sweat were together on the east side of the track as the north-bound train containing the "bad-order" car pulled in on its track, and both, attracted by the chain coupling, walked up to where the car had come to a stop, and Snyder, being present, saw all that transpired respecting the accident. He testified, in substance: Gale (the conductor hauling the "bad-order" car) stepped between the cars first, and Sweat immediately afterward; the draw-bar was out on the south end; the coal car was fastened to the lumber car with a chain; was not very tight; the pin-lifter had been broken off and was hanging down almost to the ground; saw Gale take hold of pin-lifter and give it a jerk, but didn't budge it, then Sweat took hold on east side and tore it off and handed it to Gale, who threw it on the car; first thing I heard Gale say was about taking up a link in the chain, he said he figured on taking up a link in the chain; from place Gale stood he could not pick up pin-lifter; Sweat was the only man from where he was standing; I was going in there to help, but Sweat beat me to it; at time of crash Sweat did not have his hands on anything, he was just turning his body a little; it was about one minute and a half from the time the train stopped until it backed up and the accident happened,

and Sweat had not been between the cars but about half a minute before he was killed.

Owen E. Dugan, in the service of the railroad company for 25 years, part of the time as yardman, testified that there is danger in having a loose pin-lifter in a train; it is barely possible that the pin-lifter would have got under the wheels of the hind car and put it off the track.

One Koske, a brakeman on Conductor Gale's train, being unable to attend the trial, an affidavit of the defendant's counsel declaring what Koske would testify to, were he present in court, was admitted in evidence. It was admitted that Koske would testify that, upon the arrival of their train, he and Conductor Gale got off their way-car with the necessary tools for the purpose of packing a hot box on a car forward from the "bad-order" car; that he, Koske, was just opposite the opening between the cars where Gale and Sweat were killed when the engineer gave three short whistles of the engine, signifying the intention to back the train, which Koske distinctly heard; that neither Gale nor Sweat were between said cars for any purpose in connection with repairs to said coupling, but only happened to see each other on opposite sides and came into the opening for the sole purpose of holding friendly conversation; that the "bad-order" car was properly chained up and required no repairs; that Koske was in position to hear the conversation between Gale and Sweat as they stood between the cars, and that same did not pertain to any repairs to draw-bars or other parts of the train, and that Gale did not say to Koske that they would take up a link in the chain coupling, or make any other remark to indicate intentions to make any repairs to said "bad-order" car.

Witness Snyder, whose testimony respecting the accident is above related, testified in rebuttal that, when the collision occurred, Koske was not at the opening between said cars, but was half a car length forward of the chained car, and that, when collision occurred, "I hollowed to him to pull the air, and he pulled the air on the

car ahead of this car of coal," and that he promptly did so, which, if true, indicated that he must have been at or near the forward car brake when the order was given.

The above comprises the substance of all the testimony relating to the immediate scene of the accident. At the close of the trial the court, after stating certain uncontroverted facts, instructed the jury as follows:

"On this state of facts only two questions arise in this case: First, was the deceased, Norman Edward Sweat, injured and did he die as the result of said injuries while he was an employee of the defendant and while discharging a duty which he owed to the defendant? If the plaintiff has established by a preponderance of the evidence that he was injured and died as the result of the injuries by reason and on account of the violation of the safety appliance act, and that at the time he was injured he was engaged in a duty which he owed to the defendant as an employee of defendant, then the only question remaining is the amount of damages. Now, if you shall find from the evidence that the deceased was a mere volunteer or licensee, as claimed by defendant, and that it was not his duty to be between the defective car and the lumber car, then there could be no recovery in this case. Whether he was actually engaged in the discharge of his duty as an employee of defendant at the time he was injured is a question for this jury to determine upon the evidence, and on this question the plaintiff must establish by a preponderance, which means the greater weight, of the evidence, that at the time Norman Edward Sweat was injured he was an employee of the defendant and as such employee was engaged in the proper discharge of his duties to defendant. If that has been proved by a preponderance of the evidence and to your satisfaction, then the only question left for you to consider is the amount of damage. If, however, the plaintiff has failed to establish by a preponderance of the evidence that the deceased, Norman Edward Sweat, was an employee of defendant, engaged in the proper discharge of his duties

toward defendant, but was a mere volunteer or licensee, then your verdict should be for the defendant. If the evidence be evenly balanced on that question, it will be your duty to find for the defendant. But if it be shown by a preponderance of the evidence that deceased was such employee, and that in the discharge of his duty as such employee he was injured and killed on account of the defective condition of this 'bad-order' car, then you should find for the plaintiff and award such damages as will compensate his widow and children for the loss sustained."

As before stated, the jury returned a verdict for the plaintiff. Was the instruction given by the court and above quoted a correct statement of the issue to be determined, and was a verdict for the plaintiff sustained by the evidence? We think the issue submitted to the jury by the above instruction is a correct statement of the law and the facts, and that a verdict for the plaintiff is sustained by the evidence.

The defendant insists that Sweat in going between the cars, whether for the purpose of inspecting or readjusting the coupling, or otherwise, was a mere volunteer, and for that reason no recovery can be had. We do not see how it is possible to so hold in face of the rule promulgated by the defendant hereinbefore referred to, prescribing the duties of employees in such cases. It is no answer to the apparent willingness of the deceased to assist, if assistance was needed, that he had not been invited to do so, or that the crew of the train containing the "bad-order" car was able to take care of their own trouble. The rule does not require an employee before he shall assist or offer to assist, where apparently assistance may be needed, to decline such service until he shall be specially invited, or unless he shall have first determined that no one who perhaps stands in a closer relationship to the service to be performed is available. Such an attitude on the part of an employee would be a violation of both the letter and the spirit of the rule, and would result in an utter

demoralization of the object and purpose intended to be attained thereby. The deceased, in the discharge of his duty to the defendant under the rule, was justified in offering to assist, as he did, in the inspection and readjustment of the defective coupler, and we are bound to presume, in the absence of evidence to the contrary, that what he did in that regard he did in good faith and in observance of a duty required of him by his master; and to penalize him because of his faithfulness in this respect would be both unwarranted and unjust.

In this connection what the supreme court of the United States said in *Spokane & I. E. R. Co. v. Campbell,* 241 U. S. 497, 508, is applicable here:

"It is most earnestly insisted that the findings establish that Campbell was not in the course of his employment when he was injured, and consequently that judgment could not properly be entered in his favor upon the cause of action established by the general verdict. This invokes the doctrine that, where an employee voluntarily and without necessity growing out of his work abandons the employment and steps entirely aside from the line of his duty, he suspends the relation of employer and employee and puts himself in the attitude of a stranger or a licensee. The cases cited are those where an employee intentionally has gone outside of the scope of his employment or departed from the place of duty. The present case is not of that character; for Campbell, as the jury might and presumably did find, had no thought of stepping aside from the line of his duty. From the fact that he disregarded and in effect violated the order as actually communicated to him, it of course does not necessarily follow that he did this wilfully. The jury was not bound to presume—it would hardly be reasonable to presume— that he deliberately and intentionally ran his train out upon a single track on which he knew an incoming train with superior rights was then due. However plain his mistake, the jury reasonably might find it to be no more than a mistake attributable to mental aberration, or in-

attention, or failure for some other reason to apprehend or comprehend the order communicated to him. In its legal effect this was nothing more than negligence on his part, and not a departure from the course of his employment."

The court then speaks of some of the startling consequences that would ensue if held otherwise, and closes by saying: "The unsoundness of the contention is so apparent that further discussion is unnecessary."

We have examined the several cases cited by the defendant in support of its view of the present case, but, excepting three to be referred to presently, none of them, in so far as we have been able to discover, involves in any way the federal safety appliance act, nor were the courts deciding them confronted with a rule of the defendant company prescribing the duties and obligations of employees as in the case at bar, and are otherwise so dissimilar to the instant case as to be regarded without application. Nor do we believe that the application of any of the three cases referred to is sufficient to justify an extended review of the same, particularly in view of the disposition we feel compelled to make of this case on another point.

The case of St. Louis & S. F. R. Co. v. Conarty, 238 U. S. 243, the one, perhaps, most relied upon by defendant, involved a consideration of the safety appliance act, but was not affected by a rule of the defendant prescribing the duties of employees, etc., as in the case at bar. We think but a casual examination of this case will readily show that it can in no way affect the ruling required to be made in the instant case, particularly when read in connection with the later case of Louisville & N. R. Co. v. Layton, 243 U. S. 617. The same may be said of the case of Dodge v. Great W. R. Co., 164 Ia. 627, wherein the plaintiff sought to invoke the provisions of the safety appliance act, but without success. The case of Byram v. Illinois C. R. Co., 172 Ia. 631, did not involve the safety appliance act, but in the effort to save himself from the

charge of being a mere volunteer plaintiff sought to invoke a rule of the defendant company which, however, plainly appeared to have no application to the act plaintiff was engaged in performing when the accident happened. We are convinced that the ruling in the case at bar conflicts in no way with any principle of law decided in any of the cases above cited.

We are likewise of the opinion that upon the facts disclosed by the evidence in the present case the defendant is liable for the death of deceased. This disposes of the various other assignments of error relating to instructions given and instructions refused, pertaining to this phase of the case.

The remaining principal assignments of error are: (1) That defendant did not have a fair trial in the lower court; that the whole trial was one of emotion and not a fair and just consideration of the rights of the parties; that there was a stage setting cunningly indulged in by the friends of the plaintiff and her deceased husband in the interests of plaintiff and to the disadvantage and prejudice of the defendant, which the defendant was powerless to overcome, all of which culminated in the excessive verdict of $55,000, reduced by the court to $40,000; (2) that the verdict, even as reduced, is grossly excessive; (3) that the court erred in not instructing the jury that if they found for the plaintiff they should reduce to its present worth the financial loss which the evidence showed the plaintiff, suing for herself and next of kin, had sustained, and return a verdict for that sum only.

We think the defendant is entirely right on the last two assignments and has much just reason for complaint under the first one, and for all of which we think a new trial must be granted. The aforesaid assignments being so related to each other as they are, may be considered together. We have carefully examined the record, which discloses an account of things complained of occurring at the trial, of an unusual nature, for the most of which the trial court can scarcely be held responsible, but'

Sweat v. Hines.

which must be well known to counsel, as the same are specified in defendant's brief, and we feel compelled to say that there is in it much that merits disapproval— things which ought to have been avoided in common fairness to the defendant, but which indulged in could have but one effect, that of unjustly prejudicing the defendant and precluding it from a fair and even chance with plaintiff before the jury. In the belief, however, that they, or similar incidents, will not occur upon a retrial of the case, we do not stop to particularize further in this respect.

· As before stated, we think the verdict, even as rendered, is grossly excessive, and its excess is to be accounted for largely, if not entirely, in what we believe was the court's error in refusing to instruct the jury that it was their duty to reduce the ascertained proceeds of the probable future earnings of deceased to their present worth and include in their verdict that sum only. The defendant tendered an instruction of that import, but the same was refused by the court, and it gave no instruction on the subject. That the defendant was entitled to such an instruction, and that, if tendered, it was the duty of the court to give it, is, we think, borne out by all of the federal authorities on the subject, authorities which are controlling upon the state courts on the measure of damages in actions based upon the federal employers' liability act and federal safety appliance act, as was the action in the case at bar. See *Chesapeake & O. R. Co. v. Kelly,* 241 U. S. 485; *Chesapeake & O. R. Co. v. Gainey,* 241 U. S. 494. In both of these cases the Kentucky court of appeals was reversed, and for the sole reason that the state court rejected the present worth theory and approved the verdict of the jury on which a judgment was entered representing the whole bulk sum of future earnings as payable at once. See, also, *Louisville & N. R. Co. v. Holloway,* 246 U. S. 525; *Vicksburg & M. R. Co. v. Putnam,* 118 U. S. 545; *Pierce v. Tennessee Coal, Iron & R. Co.,* 173 U. S. 1.

The plaintiff insists that when the court instructed the jury that they can award such damages only as will "compensate" the plaintiff for the loss sustained, as the court did in the case at bar, the jury's verdict must be presumed to be their estimate of what the actual and true compensation is, valued at its present worth. That is virtually what the Kentucky court of appeals said in justification of its approval of a bulk verdict. But the supreme court of the United States said "the theory is erroneous," and reversed the state court. The instructions of courts in such cases almost invariably contain the direction to the jury, in one form or another, as did the courts in the Kentucky cases above referred to, that it is their duty to award such a sum only as will fully and fairly "compensate" the dependents. But we think neither court nor lawyers, much less a jury, understand from such instruction that only a sum equivalent to the present value of the aggregate of future earnings is to be awarded. That this is the correct rule, and that any other would be unwarranted, may be illustrated by the verdict in the present case as demonstrated in defendant's brief, namely: If the $40,000, the amount of the judgment rendered in this case, were turned over in bulk to the dependents herein, by placing the same at 6 per cent. simple interest, it would yield to the dependents annually a sum equal to $360 more than they ever received from the deceased in his lifetime, and yet at the end of all their lives they would still have the $40,000 intact. This is more than the law affords. As we said before, the law in such cases pretty definitely defines and limits the elements of damage to be considered, and, except in rare cases, those damages are capable of being computed with almost mathematical certainty. This is not a case where the bars may be let down and the jury allowed to scamper into the field of wild speculation and return a verdict in any sum that may suit their fancy. The plaintiff sued for $100,000, and her counsel told the jury he "wanted the largest verdict ever returned in Dawes

county." The jury not only granted his request, but went several better, and, apparently believing there was no limit, returned a verdict for a sum greater by $15,000 than the court, and even counsel himself, believed plaintiff was entitled to receive.

Except for the somewhat unusual element of damages injected in the case, alleged to result from being deprived of a few simple ordinary domestic services the deceased may have been accustomed to perform in and about the home, an element which when measured in money value, as it must needs be, is always of a most doubtful and uncertain nature at best, except, we say, for this element alone, the evidence furnishes a basis from which the damages to be awarded can be ascertained to almost a mathematical certainty. Applying the formula for obtaining the present worth on the basis of the annuity tables prescribed in the Nebraska statute, which has been the method followed in this state for a great many years, and assuming, as the evidence shows, that deceased earned $200 a month, which is probably the apex of wartime wages, and that his personal expenses did not exceed $30 a month, so that he contributed to his family $170 a month, or $2,040 a year, and assuming, further, that he would have continued doing so throughout his whole 30 years' expectancy of life, the present worth of the entire proceeds on the ordinary 6 per cent. basis would be exactly a fraction less than $21,857.15.

We do not wish to be understood as saying that this is the exact sum, no more nor no less, which should be awarded for future earnings. It depends on the rate of interest at which the proceeds should be computed, and perhaps whether or not the interest should be computed on the system of annual rests, but what we do mean to say is that this is the principle on which the award for future earnings should be made, and, approximately speaking, the above sum cannot be far from the just amount to be awarded in this case.

If, perchance, plaintiff should claim, that we have a

Sweat v. Hines.

right to assume that the jury found that the deceased would have outlived his expectancy and thereby increase the aggregate earnings proportionately, the answer is that there is no justification for such claim.   For the jury to have done so, with 30 years intervening between decedent's death and the end of his expectancy, would be the purest speculation.   Too many things are likely to intervene to shorten life, and few, if any, to lengthen it during so long a time.   If it were a case where the deceased had already approached the end of his expectancy, and immediately before his death he was shown to be a person of sound and vigorous physical and mental health, there might be some justification for one to conclude that such person would outlive his expectancy a few years, but in our opinion no such theory can be indulged in where the time intervening between the death of one and the end of his life expectancy is so great as that existing in the present case.

Aside, then, from that which might properly be allowed for the loss of simple, domestic services before referred to, of the money value of which no evidence was offered, it is difficult to see how the judgment could be greater than the amount above indicated.   While the domestic services referred to may be invaluable, estimated from a standpoint of sentiment and parental association, measured by a money value, as they must be, they cannot be more than inconsiderable under the evidence in the case. So that even allowing a most liberal sum for this item would still leave the judgment rendered grossly excessive.

We regret that it seems necessary to order a new trial of the case, and were it not for this item of domestic services above mentioned, the court could readily adjust the amount to be awarded with exact justice to both parties, but, because of this and the errors pointed out in the record, the judgment must be reversed and a new trial ordered.

REVERSED.