# SPOKANE & INLAND EMPIRE RAILROAD COM-
## PANY *v.* CAMPBELL.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE
### NINTH CIRCUIT.

No. 325.  Argued April 26, 1916.—Decided June 12, 1916.

In an action under the Employers' Liability Act brought by an engineer of an interstate electric road, for injuries resulting from a collision the jury found a general verdict for plaintiff; and, in accordance with the practice of the State, made special findings that the violation by plaintiff of orders received before starting was the proximate cause of the collision and that immediately before the collision the brakes on the train were insufficient to enable him to control the speed of the train. *Held* that:

On the record the jury must have found that the defective air brakes were a proximate cause of the collision.

Under the Safety Appliance Act, if the equipment was defective or out of repair the question of whether it was attributable to the company's negligence or not is immaterial.

An electric interstate road is not exempted from the requirements of the Safety Appliance Act because its terminals run over street railways. *Spokane &c.* v. *United States, ante,* p. 344.

The fact that an employee may have violated an order does not take him from the protection of the Safety Appliance Act; if, as an actual fact, the brakes were defective and such defectiveness was a proximate cause of the injury.

Proof that an employee violated an order is not proof that he did so wilfully; and where wilfulness is not found such violation is only negligence and not a departure from the course of employment.

The right of an employee of an interstate carrier by rail to recover for an injury depends upon the Acts of Congress, to which all state legislation affecting the subject-matter yields.

Where the contributory negligence of the injured employee and the defendant's violation of the Safety Appliance Act are concurrent proximate causes the Employers' Liability Act requires the former to be disregarded.

*Quære* whether under the conformity act (Rev. Stat. 914) the Federal trial court is required to adhere to the state practice governing the effect of a general verdict and special findings.

217 Fed. Rep. 518, affirmed.

THE facts, which involve the construction and application of the Employers' Liability Act and the Safety Appliance Act and the validity of a judgment for damages for personal injuries against a company operating an interstate electric railway, are stated in the opinion.

*Mr. W. G. Graves*, with whom *Mr. F. H. Graves* and *Mr. B. H. Kiser* were on the brief, for the plaintiff in error.

*Mr. H. Lowndes Maury*, with whom *Mr. E. H. Belden*, *Mr. W. C. Losey* and *Mr. H. R. Newton* were on the brief, for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

This action was brought by Campbell in the United States District Court for the Eastern District of Washington to recover damages for personal injuries, and was based upon the Federal Employers' Liability Act of April 22, 1908 (c. 149; 35 Stat. 65), and the Safety Appliance Act of March 2, 1893, as amended March 2, 1903 (c. 196; 27 Stat. 531; c. 976; 32 Stat. 943). A judgment in plaintiff's favor was affirmed by the Circuit Court of Appeals (217 Fed. Rep. 518), and the case comes here on writ of error.

At the time of Campbell's injury, July 31, 1909, the company was operating a single track electric railway between the city of Spokane in the State of Washington and the town of Cœur d'Alene in the State of Idaho. It was operated under standard railroad rules. The running time of regular trains was fixed by a time table, upon which they were designated by numbers. Special trains were run by telegraphic orders given by a train dispatcher, whose office was in Spokane. Under the rules, regular trains were superior to special trains, and specials were required to look out for and keep out of the way of

the regulars.  Unless a special train had orders from the train dispatcher fixing a meeting point with the regular train, or in some other way giving it a right to disregard the time when the latter was due according to the time table, it was required to be clear of the main line at any point five minutes before the regular train was due at that point according to the time table.  Campbell was an experienced motorman, had been in the company's employ for several years, and was conversant with its rules and its methods of train operation.  On the day he was injured he was the motorman in charge of a special train running between Spokane and Cœur d'Alene, made up of a combined motor and passenger car and two trailers, and referred to in the train orders as Motor 5, that being the number of the motor car.  The train was equipped with Westinghouse air brakes.  After several trips between the *termini,* it was at Cœur d'Alene about 4.30 o'clock in the afternoon, ready to start for Spokane when ordered to do so.  Regular train No. 20 was about due to arrive.  Under orders presently to be mentioned, the nature of which was in dispute, Campbell started his train west from Cœur d'Alene, and had proceeded some distance when he discovered a train approaching on the same track from the opposite direction.  Upon seeing this he applied the brakes, without success, and there was a collision, in which he received serious personal injuries.  The train with which he collided was regular No. 20.

His complaint in the action counted upon two grounds of recovery: (a) That the company, through its agents and employees, negligently instructed him to proceed with his train from Cœur d'Alene to Spokane, and to meet and pass No. 20 at the town of Alan, a station west of the point of collision; and (b) That the collision was directly due to the failure of the company to furnish him with a motor and train supplied with proper air brakes

in' working condition. The action was tried before the District Court and a jury, when evidence was introduced to the following effect:

Campbell testified that having arrived in Cœur d'Alene with his train about 4.20 p. m., and brought it into position to return to Spokane, he received through the conductor, Whittlesey, orders both written and oral for the running of the train; that the written order said that "Motor 5 would run special Cœur d'Alene to Spokane and would meet Number 20 at Alan;" that when the written order was received Campbell was in his cab, ready to start, and that the conductor on delivering the order to him, said: "All right, go ahead; get out of town." Campbell was unable to produce the written order. If its contents were as he testified, he was justified in at once leaving Cœur d'Alene and running to Alan, the order giving him a right of way over all trains to that point. But defendant's evidence was to the effect that the written order actually read: "Motor 5 will run spl. C. d'Alene to Spokane, meet spl. 4 east at Alan." Campbell admitted that if this was in fact the order it did not authorize him to leave Cœur d'Alene before No. 20 came in, for it made no mention of that train, and did not supersede the right given to it by rules and time table. Nor was it contended in his behalf that the conductor's verbal order could in any way modify the written order. It appeared that there was a land registration in progress at Cœur d'Alene, and because of the resulting rush of travel incoming trains stopped at the west end of the yard and went on a Y switch, where the train was turned and then backed down to the Cœur d'Alene station, while trains ready to leave Cœur d'Alene upon the arrival of an incoming train would run to the end of the yard between the legs of the Y, wait there for the incoming train, and pull out as soon as it headed in on the Y. Whittlesey testified that he intended the train to go to the Y and

wait there for No. 20.   Because, as Campbell testified, his orders were to go to Alan to meet No. 20, he did not stop at the Y.   He testified that soon after passing this point, and while running at about 30 miles per hour (there was a slight descending grade), he saw an east-bound train (it was proved to be No. 20), coming on the same track at a distance which from his testimony and that of others might have been found to be upwards of 800 feet.  He immediately shut off the power, and then "dynamited her," that is, threw his air brake into emergency so as to apply the air pressure upon the train brakes to the full capacity.   He testified in effect that the brakes took hold properly, and held for approximately 35 or 40 feet, when the air released (another witness said it "leaked off"), and after that there was nothing he could do to stop the train except to reverse, which he endeavored to do but without success.   There was no hand brake. He testified that if the air brakes had worked properly he could have stopped his train and avoided a collision; that when they took hold they reduced the speed to about 20 miles per hour; that when released the train shot forward at approximately 18 or 20 miles an hour; "then I stopped it a little bit with my reverse, so that at the moment of collision I think we were going about fifteen miles an hour."   No. 20 meanwhile had been brought almost if not quite to a stop.

Under instructions from the trial court the jury, besides returning a general verdict, which was in favor of the plaintiff with $7,500 damages, made three special findings in writing: (1) That Campbell before leaving Cœur d'Alene received a train order reading as follows: "Motor 5 will run Spl. C. d'Alene to Spokane, meet special 4 east at Alan;" (2) that the air brakes on Campbell's train immediately before the collision were insufficient to enable him to control the speed of the train; (3) that Campbell's leaving Cœur d'Alene in violation of

his orders was the proximate cause of the accident. There was a motion for judgment in favor of defendant on the special findings notwithstanding the general verdict, which was denied, and it is to this ruling as well as to certain instructions given and refused to be given that the assignments of error are addressed.

The general verdict and the special findings were taken pursuant to the state practice prescribed by certain sections of the Code permitting the trial judge to instruct the jury, if they render a general verdict, to find upon particular questions of fact to be stated in writing, and providing that "When a special finding of facts shall be inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly." 1 Rem. & B. Ann. Code, §§ 364, 365. The rule established by decisions of the Supreme Court of the State is that where the general verdict and the special findings can be harmonized by taking into consideration the entire record of the cause including the evidence and the instructions to the jury, and construing it liberally for that purpose, it is the duty of the court to harmonize them, and that where a special finding is susceptible of two constructions, one of which will support the general verdict and the other will not, that construction shall be adopted which will support the general verdict. *Pepperall* v. *City Park Transit Co.*, 15 Washington, 176, 180, 183; *Mercier* v. *Travelers Ins. Co.*, 24 Washington, 147, 153, 154; *McCorkle* v. *Mallory*, 30 Washington, 632, 637; *Crowley* v. *Nor. Pac. Ry.*, 46 Washington, 85, 87, 88; *Sudden & Christenson* v. *Morse*, 55 Washington, 372, 375; *Cameron* v. *Stack-Gibbs Lumber Co.*, 68 Washington, 539, 544.

Whether under the Conformity Act (Rev. Stat., § 914) the trial court was required to adhere to the state practice governing the effect of the general verdict and the special findings may not be free from doubt. See *Nudd* v. *Bur-*

rows, 91 U. S. 426, 441; *Indianapolis &c. R. R.* v. *Horst,* 93 U. S. 291, 300; *Mutual Accident Ass'n* v. *Barry,* 131 U. S. 100, 119, 120; *Lincoln* v. *Power,* 151 U. S. 436, 442; *Chateaugay Iron Co., Petitioner,* 128 U. S. 544, 554; *United States* v. *U. S. Fidelity Co.,* 236 U. S. 512, 529; *Bond* v. *Dustin,* 112 U. S. 604, 609; *Glenn* v. *Sumner,* 132 U. S. 152, 156; *Central Transportation Co.* v. *Pullman's Car Co.,* 139 U. S. 24, 40; *Knight* v. *Illinois Cent. R. R.,* 180 Fed. Rep. 368, 372.

The Court of Appeals held (217 Fed. Rep. 523) that the Federal courts are not bound by local rules of practice with respect to submitting special findings along with a general verdict, or with respect to interpreting such verdicts; and that in this case it must be determined, as matter of law, and without reference to the testimony, whether the special findings entitled defendant to judgment notwithstanding the general verdict.

We find it unnecessary to decide the question of practice, and laying aside all technicalities will assume, in favor of plaintiff in error, that the verdict is to be interpreted according to the local rule—that is, by reading the special findings in the light of the issues and the evidence, but in the light also of the general verdict, so as to arrive at the true intent and meaning of the jury. So considered, the findings establish that there was no negligence on the part of the company in giving Campbell his running orders; that he received the order to meet Special 4 east at Alan, which, according to the admitted effect of the rules of the company, meant that he should not leave Cœur d'Alene until the arrival of regular No. 20; that he left Cœur d'Alene in disregard or violation of his orders, and that this was "the proximate cause" of the accident. At the same time, the special findings establish that the air brakes on his train immediately before the collision were insufficient to enable him to control the speed of the train. And the general verdict, so far as

it is supported by the evidence, must be taken as establishing every other fact in issue, not eliminated by the instructions of the trial court, that may be necessary to sustain the recovery. To quote from the brief of plaintiff in error: "The special findings establish that the general verdict was based solely upon the theory of negligence in the air brake equipment of the train." But the general verdict, interpreted in the light of the instructions given by the trial court to the jury, means not merely that the braking equipment was defective, but that this was a proximate cause of the collision. The instruction upon this point was: "If . . . you find from a preponderance of the testimony that the air brakes on the car and train operated by the plaintiff were defective and out of repair at and immediately prior to the time of the collision, and that the defective condition of the air brakes was the direct and proximate cause of the collision, or contributed directly and proximately to the collision, and to the injury to the plaintiff, your verdict will be for the plaintiff. . . . And before you can return a verdict for the plaintiff based on the allegation that the brakes were defective and out of repair, you must be satisfied from a preponderance of the testimony not only that the brakes were in fact defective or out of repair, but that their defective condition was the direct or proximate cause of the collision, as I have defined that term to you." It is true that other parts of the charge indicate that the trial court entertained the view that the proximate cause must be either Campbell's disobedience of orders or the defective air brake equipment, and that these two things could not concur as proximate causes. But he did not bind the jury by instructions to that effect; and viewing the general verdict and the special findings together, in the light of the issues, the evidence, and the entire charge, it is evident, we repeat, that the jury must have found that the defective air brakes were a proximate cause of

the collision.  In view of the testimony already mentioned, to the effect that Campbell, after discovering train No. 20, would have had ample time to avoid the collision had the train brake equipment been adequate, the conclusion of the jury was in this respect not unreasonable.

It is insisted that there was no evidence that the provision of the Safety Appliance Act respecting train brakes was violated.  It is of course settled that if the equipment was in fact defective or out of repair, the question whether this was attributable to the company's negligence is immaterial.  *St. Louis &c. Ry.* v. *Taylor*, 210 U. S. 281, 294; *Chicago &c. Ry.* v. *United States*, 220 U. S. 559, 575; *Tex. & Pac. Ry.* v. *Rigsby*, *ante*, pp. 33, 43. Hence the argument is that, according to all of the evidence, the equipment was not defective or out of repair. It appeared without dispute that it consisted of the Westinghouse standard automatic air brake, such as is in general use throughout the country upon passenger trains.  A witness in defendant's employ testified that shortly before Campbell took the train out from Cœur d'Alene on the trip in question he inspected the air brakes and found them in perfect order.  But there was much evidence besides that of Campbell himself to the effect that when he applied the emergency the brakes took hold and then leaked off so as to release the brakes.  The jury was warranted in finding from the testimony as a whole that Campbell properly applied the air when 600 feet or more from the place where the collision occurred, and that the brakes refused to work.  Expert witnesses called by defendant testified in effect that the train could have been stopped inside of 300 feet if the brakes had been in proper order.  The air brake equipment was wrecked in the collision, so that there was no explanation of the cause of its failure to operate properly; but it was a reasonable inference that there was some defect or want of repair in the valves or packing.

Next, it is insisted that Campbell's train was not such as the Safety Appliance Acts require to be equipped with air brakes. In *Spokane & Inland Empire R. R. Co.* v. *United States*, decided June 5, 1916, *ante*, p. 344, we held that this same railroad, with respect to its interurban traffic, is subject to the provisions of those Acts respecting automatic couplers, and hand-holds or grab-irons at the ends of the cars. In that case the particular reliance of the company was upon the concluding clause of the first section of the 1903 amendment (32 Stat. 943), which excepts trains, cars, etc., "which are used upon street railways." In the present case a distinction is sought to be drawn between steam and electric roads, the argument being that the provision requiring power brakes, when read in connection with the context, indicates that trains drawn by steam locomotives and operated by a locomotive engineer were alone within the contemplation of Congress. It is true that in the Act of 1893 the provision was closely associated with the mention of a locomotive engine as the motive power; the words of § 1 being:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic [after a specified date] that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." Section 6, prescribing penalties, also uses the words "locomotive engine" and "locomotives." But the 1903 amendment, which, as frequently pointed out, was enacted for the purpose of enlarging the scope of the Act (*Southern Ry.* v. *United States*, 222 U. S. 20, 26; *Southern Ry.* v. *Crockett*, 234 U. S. 725, 735), in its first section declares

that the provisions relating to train brakes (among others) shall be held to apply to "all trains, locomotives, tenders, cars, *and similar vehicles* used on any railroad engaged in interstate commerce . . . and to all other locomotives, tenders, cars, *and similar vehicles* used in connection therewith," subject to exceptions not now pertinent. The second section declares that whenever any train is operated with power or train brakes, "not less than fifty per centum of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train." Of course, an important object of having a train equipped with a system of brakes under the single control of the engineer is to permit of a prompt and effective reduction of speed when the man driving the train is notified of danger. The importance of this is precisely the same whatever be the motive power, and, in view of the beneficial purpose of the Act and the evident intent of Congress to enlarge its scope so far as necessary to guard against the dangers in view, the term "similar vehicles" must be held to have the effect of bringing electric motors and trains drawn by them within the provision respecting power or train brakes. The very exemption of trains, cars, and locomotives "used upon street railways" indicates that electric cars were in contemplation. And see *Omaha Street Ry.* v. *Interstate Com. Comm.*, 230 U. S. 324, 337; *Kansas City Ry.* v. *McAdow*, 240 U. S. 51, 54.

It is said that, conceding the power brake provision applies to electric trains, the duty imposed was not owed to Campbell under the special circumstances established by the jury's findings. The argument is that the purpose of the brake requirements is to place control of the train in the hands of the engineer so that the safety of passengers and employees may be conserved, not that the engineer should be able to escape injury from peril to which he had wrongfully exposed himself; and that Campbell cannot

bring himself within the class intended to be protected by pointing out that the situation created by his disobedience of orders was one that Congress contemplated as possible and the consequences of which it desired to guard against. This gives altogether too narrow a meaning to the Safety Appliance Act, and is inconsistent with the provisions of the Employers' Liability Act, as we shall see.

It is most earnestly insisted that the findings establish that Campbell was not in the course of his employment when he was injured, and consequently that judgment could not properly be entered in his favor upon the cause of action established by the general verdict. This invokes the doctrine that where an employee voluntarily and without necessity growing out of his work abandons the employment and steps entirely aside from the line of his duty, he suspends the relation of employer and employee and puts himself in the attitude of a stranger or a licensee. The cases cited are those where an employee intentionally has gone outside of the scope of his employment or departed from the place of duty. The present case is not of that character; for Campbell, as the jury might and presumably did find, had no thought of stepping aside from the line of his duty. From the fact that he disregarded and in effect violated the order as actually communicated to him it of course does not necessarily follow that he did this willfully. The jury was not bound to presume—it would hardly be reasonable to presume— that he deliberately and intentionally ran his train out upon a single track on which he knew an incoming train with superior rights was then due. However plain his mistake, the jury reasonably might find it to be no more than a mistake attributable to mental aberration, or inattention, or failure for some other reason to apprehend or comprehend the order communicated to him. In its legal effect this was nothing more than negligence on his part, and not a departure from the course of his employment.

To hold otherwise would have startling consequences. The running of trains on telegraphic orders is an every-day occurrence on every railroad in the country. Thousands of cases occur every day and every night where a failure by conductor or engineer to comprehend or to remember the message of the train dispatcher may endanger the lives of employees and passengers. We are not aware that in any case it has been seriously contended that because an engineer violated the orders he went outside of the scope of the employment. If he did so, in the sense of absolving the employer from the duty of exercising care for his safety, it is not easy to see upon what principle the employer's liability to passengers or to fellow employees for the consequences of his negligence could be maintained. The unsoundness of the contention is so apparent that further discussion is unnecessary.

Plaintiff in error refers to the fact that the wreck occurred in Idaho, and cites two sections of the Criminal Code of that State, one rendering a willful violation or omission of duty on the part of one in Campbell's position, whereby human life or safety is endangered, punishable as a misdemeanor; the other making willful or negligent conduct which causes a collision of trains, and the resulting death of a human being, a criminal offense. 2 Idaho Rev. Code, §§ 6926, 6909. Whether Campbell was or is punishable criminally under either of these sections we are not called upon to say. But his right to recover against his employer depends upon the acts of Congress, to which all state legislation affecting the subject-matter must yield. *Tex. & Pac. Ry.* v. *Rigsby, ante,* pp. 33, 41.

Upon the whole case, we have no difficulty in sustaining his right of action under the Employers' Liability Act. That Act (§ 1; 35 Stat. 65) imposes a liability for injury to an employee "resulting *in whole or in part* from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency due

to its negligence in its cars, engines, appliances, . . . or other equipment." As was held in *San Antonio & Aransas Pass Ry.* v. *Wagner*, decided June 5, 1916, *ante*, p. 476, a violation of the Safety Appliance Act is "negligence" within the meaning of the Liability Act. And by the proviso to § 3 of the latter Act, no employee injured or killed shall be held to have been guilty of contributory negligence in any case where a violation of the Safety Appliance Act "*contributed to* the injury or death of such employee." It is too plain for argument that under this legislation the violation of the Safety Appliance Act need not be the sole efficient cause, in order that an action may lie. The Circuit Court of Appeals (217 Fed. Rep. 524) held that the element of proximate cause is eliminated where concurring acts of the employer and employee contribute to the injury or death of the employee. We agree with this, except that we find it unnecessary to say the effect of the statute is wholly to eliminate the question of proximate cause. But where, as in this case, plaintiff's contributory negligence and defendant's violation of a provision of the Safety Appliance Act are concurring proximate causes, it is plain that the Employers' Liability Act requires the former to be disregarded.

The assignments of error that are based upon the instructions given and refused to be given to the jury raise no question other than those which have been disposed of.

*Judgment affirmed.*