## CHICAGO, R. I. & G. RY. CO. v. HARRIS.
### No. 12161.

Court of Civil Appeals of Texas. Fort Worth.
March 22, 1930.

Rehearing Denied May 17, 1930.

See, also, 24 S.W.(2d) 385.

614

Lassiter, Harrison & Pearson, and Smith & Rowland, all of Fort Worth, and McMurray & Gettys, of Decatur, for appellant.

Edwards & Hughes, of Tyler, and Burch & Woodruff, of Decatur, for appellee.

BUCK, J.

N. J. Harris was conductor on a freight train of the Chicago, Rock Island & Gulf Railway Company, running south into Bridgeport, Wise county. Harris was in the caboose of the train. Just ahead of the caboose was a cattle car. The running board or walkway on top of the cattle car is alleged by plaintiff to have been defective. When the engineer whistled for Bridgeport, Harris went out of the caboose towards the front platform. He gathered up his switch list and lantern and told J. E. Chilton, a rear brakeman and the only other person in the caboose, that he intended to go over the train towards the head end or engine. This was the last time he was seen alive. When the train reached Bridgeport he was not on or near it. On search being instituted for him, his dead body, cut in two, was found on the railroad track some distance from town. The searching party found the conductor's cap and lantern, upright and lighted, and the switch list, all near his body. Another train had gone along the track shortly after this train had reached Bridgeport, and it is suggested that it cut the body of Mr. Harris in two.

Under the train orders of Harris, he was to leave eight cars of the train, which consisted of 56 cars, at Bridgeport, for the purpose of routing said cars towards Graham, westward.

The theory of appellee, plaintiff below, in this case, is that Harris reached the top of the caboose by means of the ladder going from the platform and in attempting to step across to or hop on to the running board on the top of the cattle car ahead, and because of the defect of said walkway, he fell off the car. It is claimed that said running board was not in compliance with the Safety Appliance Acts; i. e., with the specifications provided by the Interstate Commerce Commission, under the Federal Employers' Liability Act in that one of the brackets or stays, which was intended as a support of the extension of the running board, on top of the cattle car, was loose, and had fallen down. There is some evidence that both of the metal stays were loose; however, defendant claims that only one of the stays was loose. The running board on top of the cars consists of three boards, about one inch in thickness and six inches wide; they are supported by crossbars or saddles, some three inches square, to which they are fastened by screws. At the end of the running board there is fastened under the boards a piece of timber about one inch thick and six inches wide, and fastened to this crossbar and to the car are two iron stays, so that when they are in proper condition the planks will be rigid and stable. The brackets are fastened to the crossbar and to the end of the running board by bolts.

It is urged by appellee that the purpose of the Interstate Commerce Commission in requiring this appliance to be made, as indicated, is that the ends of the running board would be rigid and would not give when a trainman stepped or sprang from one car to the running board of another; that by reason of the defect either in one brace being absent or two, the end of the running board was not rigid, and, when Harris took a long step or sprang from the caboose to the running board on the cattle car ahead, the end of said running board vibrated and he fell off and was killed.

A number of witnesses testified, many of them employees of the Rock Island Railway Company, as to whether or not it was customary for a trainman to get on top of the caboose by means of an iron ladder, and go from the top of the caboose to the next car, or cross from the platform of the caboose by means of the drawhead, or over the platform railing, and climb to the top of the cattle car by means of a similar ladder.

Appellee's contention is that the evidence sustains the implied finding of the jury that Harris first got on top of the caboose and hopped or sprang over to the top of the cattle car, and by reason of the defect in the running board of the cattle car, Harris was caused to fall off the car and be killed.

The case was submitted to a jury on special issues. The jury found that (1) on the occasion when N. J. Harris was fatally injured, the rear running board extension on the cattle car, which was next in front of and coupled to the caboose, was not securely supported to its full width by substantial metal braces; (2) that the failure to have the said running board extension securely supported its full width by substantial metal braces was the proximate cause of the death of N. J. Harris; (3) that $15,000, if paid now in cash would fairly and reasonably compensate the plaintiff for the death of her husband.

Upon this verdict of the jury, the court entered judgment for Mrs. N. J. Harris for $15,000.

■ No one saw Harris fall off the car, or even get on top of the train for the purpose of going overhead to the other end of the train. How he got from the platform of the caboose up on the caboose, or the cattle car, if he got on top of the train at all, is dependent on circumstantial evidence. A number of witnesses testified that it was usual and customary to get up on top of the cars, in going from the platform of the caboose, by using the ladder at the end of the caboose, and then stepping from the running board on top of the caboose to the running

board on top of the car ahead. Some of these witnesses, who were employees of the railway company, testified somewhat differently on the trial, and in depositions given by them before the trial. In said depositions they testified that the usual and customary way to get on top of the train from the platform of the caboose was to go up the ladder attached to the caboose and then go by means of the running board on towards the head of the train. On the trial, some of these witnesses changed their testimony, and stated that the usual and customary way was to step over to the ladder leading up on the cattle car, and go up that and get on top of the cattle car. There was evidence to sustain a finding that the deceased fell between the caboose and cattle car immediately ahead. The blood, "scraping signs," and "glancing licks" on the drawbar and the air hose tended to show that he fell between the caboose and the cattle car. Some of the witnesses testified that there was blood on top of the couplers. We think there is sufficient evidence to sustain the finding of the jury that deceased fell between the caboose and cattle car ahead and that he was facing towards the head end. Under the caboose platform ladder is a handhold made of metal or iron which one witness testified was straight when they left Waurika. When the handhold was examined after Harris fell, it was bent about an inch and one-half out of line and five or six strands of Harris' hair was sticking thereon; this grabiron is thicker than a man's finger. The train was running south towards Bridgeport at the time of the accident and Harris' lantern was found in the middle of the track about 30 feet north of his body, upright and lighted. The two cars were about three feet apart, and one witness (Barbee) testified that one going from the caboose on top of the train to the car ahead would have to step across from the caboose to the cattle car and that this was the only manner and way he could step. The cattle car was from 12 to 15 years old, as shown by the testimony of W. K. Smith, foreman in the yards at Fort Worth. The brackets being loose showed decay in the wood, as shown by the testimony of Smith. A piece of blue cloth of the color of Harris' shirt was sticking to the brake rigging of the caboose, which looked like it had been glazed off, according to the testimony of Stedman, a witness for plaintiff. Darnell, another witness, testified that Harris always used the caboose ladder to get on top of the train from the caboose platform. Darnell was the brother-in-law of Harris and had worked with him.

Appellant urges that any conclusion that Harris got on top of the caboose first and stepped over to the running board of the cattle car ahead depends merely on speculation and surmise, and that such evidence is incompetent to prove that he was killed by reason of any defect in the running board of the cattle car.

Appellant also urges that the trial court should have granted its motion for a peremptory instruction. Appellee, on the other hand, urges that the evidence, although largely circumstantial, amply supports the contention that Mr. Harris climbed up the ladder on top of the caboose and in attempting to step over onto the running board of the cattle car, by reason of the defect in it, causing it to vibrate, was thrown between the caboose and the cattle car and was killed.

On first consideration of this case, we certified to the Supreme Court the question as to whether, under the facts shown, there was sufficient evidence to show that Harris fell off the train as he was attempting to step from the running board on the caboose to the running board on the cattle car. We were of the opinion that the question as framed presented a question of law, but the Supreme Court dismissed the certificate because, as held, we had presented a question of fact.

 Therefore we will proceed to decide this question so vital to the case. We conclude that taking the evidence as a whole and largely circumstantial as it is, that the facts as above related, and other testimony to the same effect, was sufficient evidence to show that Harris fell off the train as he was attempting to step from the running board on the caboose to the running board on the cattle car; that his fall was the proximate result of the defect in the running board of the cattle car.

The evidence shows that conductor Harris weighed some 200 pounds, and we believe that a man of that weight moving on the top of a train, running at the speed that train was running and springing or hopping from the running board of one car to the running board of another, would strike the end of the running board of the cattle car with sufficient force, unsupported by brackets, or by not more than one bracket, as it was, to cause the unsupported end of the running board to vibrate; that such vibration, under the circumstances, caused Harris to fall between the cars.

During the trial, J. M. Little, witness for plaintiff, testified that at the request of Mr. Hughes, probably the plaintiff's attorney, he made an examination in the Fort Worth yards of some Rock Island cars. That he had been a switchman for three years and a fireman for two and one-half years; that during that time he observed the way the trainmen on the Rock Island carried on their work; that it was in the usual way any railroad man carries on his work; that he was familiar with the type of stock car used by the Rock Island, and had seen the cattle car next to the caboose in this case. That he was familiar with the safety appliances on

this type of cattle car. That if a trainman or conductor came out of the door of the caboose and desired to go to the head end of the train while the train was running, the only means or safety appliance to use for this purpose is the caboose ladder, which takes him to the top of the caboose, and then stepping or walking over from one car to the other. That the caboose ladder is the only way to go to be safe. When he got to the top of the caboose he would, then step from the end of one running board extension across to the end of the other running board extension; that a man hops across because the train might break in two at any time and he hops, so that if the train breaks in two he will not have one foot on one car and the other on another. That that had been his usual and customary way throughout his service. That a man in hopping across from one car to another depends on the running board to be firm and secure.

█ The first proposition is that the testimony of J. M. Little, objected to in bill of exception No. 7, invaded the province of the jury, and was the statement of the witness as to a matter which was to be determined by the jury, and the evidence was improperly admitted. We think there was no error in the admission of this testimony as witness showed himself familiar with the location, structure, design, and intended use of these railway appliances. He had been working for the railroad for a number of years and was qualified to state that the designed and intended appliance for mounting to the top of the train from the caboose platform was the caboose ladder. The witness qualified as an expert on the question of the use of the means at hand to go from the platform of the caboose to the top of the cattle car.

█ The second proposition is that the testimony of Tom Messer was erroneously admitted because it was not responsive. It is contended that the defendant's objection to the testimony on that ground should have been sustained. There is no reference to any bill of exception in the record, either under this proposition or under the third proposition, which complains of the admission of the testimony of the witness Boucher. · The court is not required to search the record to discover whether or not an appellant has reserved properly any assigned error. This bit of testimony appears to have been offered from a deposition. The assignment should be overruled, for it is held that an objection to an answer that it is not responsive can be taken advantage of only by a motion to quash, and made in due time. Cook v. Denike (Tex. Civ. App.) 216 S. W. 437, and cases there cited. Moreover, this proposition and the third relate to the introduction of a question and answer, to wit: "Interrogatory 46: State, if you know, what appliance could be used in so getting to the top of the train from the platform of the caboose? Answer: The ladder on the caboose is the only appliance that could be used in getting to the top of the train from the platform of the caboose."

Like testimony to these two bits of testimony was introduced without objection.

The witness J. E. Clifton testified: "From that position the ladder on the caboose would be the only way up to the top of the train taking the usual and ordinary route."

Barbee, another witness, testified that: "The ladder is and would be the only way and means that a conductor or trainman can get to the top of his train from the platform of the caboose."

█ Many other witnesses testified to the same effect and it is a well-recognized rule that, where other testimony has been admitted without objection of the same tenor to that objected to, the assignment will be overruled. Slayden v. Palmo, 108 Tex. 416, 194 S. W. 1103; Pullman Palace Car Co. v. Smith, 79 Tex. 468, 14 S. W. 993, 13 L. R. A. 215, 23 Am. St. Rep. 356, and other cases.

█ The fourth proposition is that the court erred in not allowing the defendant to make a test, in the presence of the jury, of the rigidity and resistance of the running board extension on the model produced by the defendant in the courtroom. It is urged, by appellant that the evidence was undisputed that the model was an exact replica of the running board on the stock car next to the caboose, between which cars the deceased fell, except that the lumber in the model was greener than the lumber on the car, and was therefore less rigid and more· flexible, and would have been more likely to give or bend under pressure, than would the lumber on the car. The trial court qualified the bill of exception to the admission of this demonstration as follows:

"Defendant's bill of exception No. 11 is qualified as follows: The evidence shows that the model was not an exact duplicate of the car running board in question; and that the model was made of new and sound lumber, whereas the running board on the car in question was constructed of old lumber at the time of the fatal injury; and that, as addressed to an experiment with the model by the jury, the condition encountered by decedent on account of the running and vibration which the evidence showed would affect the situation ninety per cent could not be simulated or reproduced in the court room with the model.

"Moreover, the proceeding which occurred with respect to this model, as shown on page 280 of the statement of facts, was as follows:

" 'The court overruled plaintiff's motion that the model not be exhibited to the jury and permits it to be introduced. The court

overruled defendant's motion to allow the jury to experiment with the model. The jury is permitted to view the model and its parts but no experimentation or demonstration of it is allowed.' "

Under the qualification we see no error in the action of the trial court in not permitting the defendant to make an actual test of the replica introduced in evidence. In passing upon questions of excluded testimony or excluded exhibits, the appellate court is required to accept as true the statement of the court in such qualification. San Antonio Traction Co. v. Settle, 104 Tex. 142, 135 S. W. 116; Standard Ins. Co. v. Williams (Tex. Civ. App.) 4 S.W.(2) 1023. Appellant having accepted the bill with the court's qualification is bound thereby. The court, as shown in the qualification, admitted the replica in evidence and instructed the jury that they might look at it and its parts, but did not allow the defendant to make an experimentation or demonstration of the replica. This assignment is overruled.

The fifth proposition deals with alleged improper argument of Mr. Burch, counsel for plaintiff below. The objection under the proposition is that: "The argument of the plaintiff's counsel was outside of the record, and improper, and prejudicial to the defendant's rights, and the court should have instructed the jury to disregard it. The harmful effect of this improper argument was increased by reason of the jury listening to the objection of the defendant and the court overruling the objection."

The bill of exception is as follows:

"Be it remembered that during the trial of the above entitled cause and while Mr. Burch, one of plaintiff's attorneys, was making his argument to the jury, he said in substance that W. K. Smith in his anxiety and zeal to protect his job with the Rock Island had no respect for the truth; that when said remark was made, defendant, through its counsel, then and there objected and excepted to same on the ground that it was outside the record, improper and prejudicial; that counsel for defendant then and there asked the court to sustain said objection and instruct the jury not to consider said remark of Mr. Burch for any purpose; that thereupon Mr. Burch said to the jury in substance that said Smith would swear anything in the world to protect his job; that defendant's counsel thereupon renewed and repeated the same objection and the same request to the court; that the court took no action except to say to counsel for defendant that if he would prepare a written instruction on the matter, the court would consider it; that thereafter, and before the conclusion of the arguments to the jury, defendant's attorney prepared and presented to the court a written instruction not to consider said remarks of

Mr. Burch for any purpose; and that the court refused to give to the jury such written instruction and marked and signed his refusal thereon, whereupon same was filed with the clerk and made a part of the record and is hereby referred to.

"Wherefore, said defendant now here tenders this its bill of exception evidencing the matters and things hereinabove stated and prays that the same be allowed filed and made a part of the record in this cause."

The court qualified this bill as follows:

"Defendant's bill of exception No. 13 is approved with the following qualification and explanation:

"The witness W. K. Smith, whose testimony was the subject of the argument of counsel referred to in the bill, testified by oral deposition taken months before the trial. The subject of counsel's argument was the discrepancies between the testimony given by the witness by oral deposition months before the trial and his evidence on the same matter given on the trial of the case having been called as a witness by the defendant. In his former evidence by oral deposition months before the trial (as shown by pages 179, 180 of the statement of facts), this witness testified:

"Q. Now coming to that part of your cross-examination with reference to the manner and way that you would get to the top of the running board or on top of the train, how would you get on top of the train if you were on the caboose? A. Personally, myself, I would go up the ladder of the caboose to the running board and then from the caboose to the running board of the car.

"Q. Why? A. Because it is the safest method to pursue.

"Q. Why? A. Because you are on your platform of your caboose and you simply go up your ladder to your running board, which extends up seventeen inches—your ladder extends up seventeen inches above the running board of your caboose to support you up on your caboose to your running board when you are in an upright position.

"Q. All right. In your observation and experience and as a general rule and custom, what appliance on the caboose do trainmen and brakemen use to get up on top of the running board? A. They use the ladder.

"At variance with his former testimony, he testified in behalf of the defendant at the trial, as shown on page 284 of the statement of facts, as follows:

" 'I wouldn't consider it would be unsafe or would affect the use of it by trainmen in stepping across on it in going from car to another. Yes, I have had occasion in my railroad experience to go from the caboose platform to the top of the car next ahead of the caboose while the train was in operation out on the road. I have seen other trainmen do it also.

618

I and others I have seen do that will usually—to the caboose platform and across to the ladder on the first car in front and ascend the ladder on the car.'

"Moreover, another material discrepancy in his testimony was his estimate of the distance the saddle block under the running board was situated from the end of the car. In his former testimony his estimate of the distance between the saddle block and the edge of the car was approximately 7¼ inches. Having sworn that the model he had constructed was an exact duplicate of the running board on the car involved in the fatal injury, it was shown that the saddle block in his duplicate sat back from the edge of the car only two to three inches. The discrepancy is shown by the testimony of the witness on page 288 of the statement of facts as follows:

"'I did not measure the distance from the end of the saddle board to the edge of the roof, but the saddle block is back from the edge of the car approximately 7¼ inches was my estimate of the distance at that time. We do not have that stock car here. We had the car here the morning Mr. Harris was killed, yes. We personally could bring the car (evidently meaning the running board of the car) to the courthouse.'

"In view of these discrepancies and admissions by this witness that he was the official of the Rock Island Railroad having general supervision over, and whose duty it was to keep these safety appliances on the cars in proper repair, the court felt that the remarks of counsel objected to were fairly within the domain of legitimate argument."

 The objection to this argument by appellant is that it was "outside the record and improper and prejudicial to defendant's rights." Appellant does not show in what way it was improper or prejudicial to defendant's rights. On that account appellee argues that appellant, having accepted the bill with the qualification made thereon by the trial court, cannot now deny that this is the status of the record, under the authority of Benavides v. Garcia (Tex. Civ. App.) 283 S. W. 611; Wacasey v. Wacasey (Tex. Civ. App.) 279 S. W. 611; Hawkeye Ins. Co. v. Cashion (Tex. Civ. App.) 293 S. W. 664. As stated by the trial court in his qualification of this bill of exception "the material discrepancies" in Smith's evidence were (1) the witness testified by oral depositions months before the trial as to the manner or how he "would get to the top of the running board or on top of the train * * * if he were on the caboose." He answered that he would go up "the caboose ladder to the running board and then from the caboose to the running board of the car" because it is the "safest method," explaining why, and further stating that such use of such appliance under such situation was the "general rule and custom." This, as the court

says, was at variance with his former testimony. He testified at the trial that he would not consider it unsafe to step across and use the car ladder, and further stated that it was done "usually." In view of the discrepancies in the testimony of the witness on the two occasions when he testified, and in view of the fact that he was an officer of the Rock Island Railroad, having general supervision over it and whose duty it was to keep the safety appliances on the car in proper repair, we agree with the trial court that the remarks of counsel objected to were fairly within the domain of legitimate argument. Moreover, the bill was fatally defective in failing to negative an argument not justified by evidence or responsive to opposing argument.

 In Kansas City, M. & O. Ry. Co. v. West, 149 S. W. 206, 210, by the Austin Court of Civil Appeals, it is said: "The bill of exceptions merely states the remarks made, without negativing the idea that they may have been called forth either by the evidence or in response to argument by opposing counsel. The bill is fatally defective in these particulars, merely stating the remarks of counsel. To be sufficient, it must state enough of the evidence or the facts proved in the case to make intelligible the ruling of the court excepted to. Rule 59 (67 S. W. XXIV). While our statute prescribes that no particular form of words shall be required in the bill of exception, still the objection to the ruling or action of the court shall be stated with such circumstances or so much of the evidence as may be necessary to explain the ruling."

 The court further says: "The bill must disclose sufficient facts to show that the supposed error of the court is not merely an abstract one. See Litten v. Thompson, 2 U. C. 577." See T. P. C. & O. Co. v. Grabner (Tex. Civ. App.) 10 S.W.(2d) 441; Tex. Emp. Ins. Ass'n v. Heuer (Tex. Civ. App.) 10 S.W.(2d) 756. The assignment is overruled.

The sixth proposition is that: "It was error on the part of the plaintiff's attorney to interrupt the defendant's counsel, and to make the statement and to use the language in the presence of the jury, complained of in defendant's bill of exception No. 14. The action and language complained of were improper and prejudicial to the defendant's interests."

The bill of exception referred to is as follows: "Be it remembered that during the trial of the above entitled cause and while R. M. Rowland, one of defendant's attorneys, was addressing the jury and in his argument made reference to the attacks made by plaintiff's attorney Mr. Hughes, on the witness, W. K. Smith, said Hughes interrupted Rowland in his argument and said in substance, 'is not that the way you would feel if you thought a witness on the other side had committed perjury?' You would think he was trying to put over perjury testimony on you';

that thereupon said Rowland turned from the jury and, addressing the court, objected and excepted to said remark of Hughes on the ground it was an improper sidebar remark and prejudicial to the defendants' rights, and he asked the court to withdraw it from the consideration of the jury; that the court took no action except to tell Mr. Hughes not to interrupt counsel while he was speaking to the jury; and that defendant, through its attorney aforesaid, then and there in open court duly excepted to said remark of plaintiff's counsel and to the failure of the court to instruct said jury not to consider said remark for any purpose.

"Wherefore, said defendant now here tenders this its bill of exception evidencing the matters and things hereinabove stated and prays that the same be duly allowed, filed and made a part of the record in this cause."

 We overrule this assignment, partly for the reasons stated in reference to the fifth assignment. It has been held that counsel pursuing a line of argument not called for by facts invites a reply, and the party so represented cannot complain of objectionable language in reply. Texas & P. Ry. Co. v. Garcia, 62 Tex. 285. We think that the trial court, in admonishing plaintiff's attorney not to interrupt counsel for defendant while he was addressing the jury, did all that was necessary and required under the circumstances.

The seventh proposition is that: "It is the well-settled and repeatedly declared law that in determining a question of fact by circumstantial evidence one presumption cannot be based upon another. It was the defendant's right to have the jury so instructed in this case."

No complaint is made of any action of the trial court. The defendant tendered the following instruction: "You are instructed that in arriving at a finding upon circumstantial evidence you are not permitted to base one presumption upon another."

 This instruction was refused. It is true that in a case where one presumption is sought to be based upon another, this charge is proper, but no evidence is cited in the brief of appellant showing that such a condition exists in the instant case. We overrule this assignment.

The eighth proposition is that: "Under the evidence it was the defendant's right to have the jury instructed that if they believed the injury to the deceased was an accident, they should answer 'no' to question No. 2 in the court's main charge, which question was whether the failure to have the running board extension supported its full width by substantial metal braces was the proximate cause of the death of the deceased."

The court gave defendant's special charge No. 3 as follows: "Gentlemen of the Jury:

While you have been instructed in the main charge that any fact may be proved by circumstantial evidence, you are here further instructed that any finding of fact based upon circumstantial evidence must be reasonably supported by proof and must not be based upon mere surmise, suspicion or conjecture. In other words, the circumstances, themselves, must be proved by a preponderance of the evidence and must be such as to make the conclusion reached a more reasonable conclusion than any other that could be reached about the matter."

 The federal statute requires that cars be equipped with "secure running boards" (45 USCA § 11). Section 12, of chapter 1, of title "Railroads" (45 USCA), provides that "the number, dimensions, location and manner of application of appliances provided for by sections 4 and 11" shall be "designated by the Interstate Commerce Commission." The courts must take judicial notice of the rules of the Interstate Commerce Commission passed pursuant to the Federal Safety Appliance Act (45 USCA § 1 et seq.). Thompson v. Ry. Co. (C. C. A.) 15 F.(2d) 28. If the appellant violated the Federal Safety Appliance Act, and such violation was the proximate cause of the death of N. J. Harris, then no other negligence, or negligent act, was necessary to be shown. Great Northern Ry. Co. v. Donaldson, 246 U. S. 121–128, 38 S. Ct. 230, 62 L. Ed. 616, Ann. Cas. 1918C, 581. Appellant cites the case of Colo. & So. Ry. Co. v. Rowe, 238 S. W. 908, by the Commission of Appeals, approved by the Supreme Court. In that case the only holding apparently pertinent to the issue here presented is that the Commission of Appeals held that the court shall submit the case requested on special issues raised by the pleading and evidence, and, that article 1985 of the 1914 Annotation (Vernon's Sayles' Ann. Civ. St. 1914) shall be construed in connection with article 1984a of the same annotation, in an action against a railroad for the negligence resulting in death of a brakeman, where the evidence raised the issue that the death was caused by unavoidable accident, and that the refusal to submit special issue as to the liability of the railroad in case of accident was error though it was negative of the issue submitted.

 In the present case the contention is that appellant had violated the Safety Appliance Act, and if such violation was the proximate cause of the death of Harris, then the plaintiff was entitled to recover. The only negligence asserted was negligence per se, a violation of the Federal Safety Appliance Act. The instruction requested was that if the jury believed from the evidence that the fatal injury to Harris was a pure accident, that is to say, was not directly caused by negligence on the part of said Harris himself, "you are instructed to answer 'No'

to question No. 2 in the court's main charge." It was not a request to submit the issue as to whether or not the death of Harris was a pure accident. If that had been requested it probably should have been given. If the appellant company violated this act, and thereby caused the death of Harris, such violation eliminated contributory negligence. It is held in Spokane & Inland Empire Ry. Co. v. Campbell, 241 U. S. 497, 36 S. Ct. 683, 60 L. Ed. 1125, by the U. S. Supreme Court, that a recovery may be had under this act where the violation of the Safety Appliance Act and the contributory negligence of the deceased are concurring proximate causes in view of section 1 of the Federal Employers' Liability Act (45 USCA § 51) imposing a liability for an injury to an employee resulting "in whole or in part" from the negligence of any of the officers, agents, or employees of the carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, etc.

We do not think that this instruction should have been given, inasmuch as it does not purport to define what would be a pure accident, nor ask for a submission to the jury of an issue as to whether or not it was a pure accident. Where a thing happens so often as to become a well-known fact and a matter of common knowledge, it can hardly be called a "pure accident." The purpose of the passage of this Safety Appliance Act was to protect the trainmen as they hurried along on top of trains in daytime and at night, and in all kinds of weather, and upon moving trains, and the enactment of the act is a striking commentary upon the frequency of accidents to trainmen as in the pursuit of their duties they hurry along the running boards of moving trains. It is not at all clear that unavoidable accident is involved in this case. At any rate, we do not believe any error is shown in the failure to give the instruction tendered, there being no assignment directed to the failure of the court to submit the issue of unavoidable accident.

The ninth proposition is directed to the failure of the trial court to submit issue No. 2, tendered by appellant, which is as follows: "Did N. J. Harris use ordinary care for his own safety in the way and manner in which he attempted to cross from the caboose to the car immediately in front of same?"

As stated in Spokane, etc., Ry. Co. v. Campbell, supra, even though N. J. Harris did not use ordinary care for his own safety in the way and manner he attempted to cross from the caboose to the car immediately in front of same, such contributory negligence would not have barred recovery. Therefore, it would have been an immaterial issue if in fact his death was caused either in whole or in part by the defect in the attachment supporting the end of the running board. Nor do we think that the tenth proposition presents error, for the same reason.

For the reasons stated, all assignments are overruled and the judgment is affirmed.

## On Motion for Rehearing.

DUNKLIN, J. (dissenting).

As shown in the opinion of Justice BUCK on original hearing, no one witnessed the accident which resulted in the death of N. J. Harris, and circumstantial evidence alone was relied on to prove that his death resulted from stepping on the end of the running board on the cattle car attached to the caboose of the train. Plaintiff's theory was that Harris attempted to go from the caboose to the front end of the train, and that in order to do so he climbed to the top of the caboose and then passed over the opening between it and the cattle car ahead; that when he stepped upon the end of the running board on top of the cattle car it suddenly sprang down by reason of the defective supports thereunder, and the furnishing of which in that condition was negligence on the part of the defendant, and that by reason of such insecure condition of the running board Harris was thrown off his balance and was caused to fall between the cattle car and caboose and thereby to be killed.

Assuming for the sake of argument that testimony introduced by the plaintiff tended to show that Harris did attempt to pass from the top of the caboose to the cattle car, and that he lost his life in making that attempt, yet in order to make out plaintiff's case she had the burden of showing that Harris did not lose his balance by reason of the motion of the train or some other cause and fall between the cars while attempting to step across the opening, but that he crossed the opening without so falling; that he stepped upon the end of the running board of the cattle car and when he did so it sprang down by reason of the insecure supports thereunder sufficiently to throw him off his balance; that he was thus caused to lose his balance; and by reason thereof was caused to fall between the caboose and the cattle car. In order to support findings in plaintiff's favor upon those issues, it was necessary in this case to support one inference or presumption by another inference or presumption, in violation of the rule announced by our Supreme Court in Fort Worth Belt Ry. Co. v. Helen Jones, 106 Tex. 345, 166 S. W. 1130, 1132, in the following language: "A presumption of fact cannot rest upon a fact presumed. The fact relied upon to support the presumption must be proved. 'No inference of fact should be drawn from premises which are uncertain. Facts upon which an inference may legitimately rest must be established by direct evidence, as if they were the

facts in issue. One presumption cannot be based upon another presumption.' 16 Cyc. 1051; Missouri Pac. Ry. Co. v. Porter, 73 Tex. 307, 11 S. W. 324."

And the rule announced in that case has been uniformly followed by many other decisions such as G., C. & S. F. Ry. Co. v. Davis (Tex. Civ. App.) 161 S. W. 932 (writ of error refused); Medlin Milling Co. v. Mims (Tex. Civ. App.) 173 S. W. 968 (writ of error refused); St. L., S. F. & T. Ry. Co. v. West (Tex. Civ. App.) 174 S. W. 287 (writ of error refused) Coffman v. Texas Midland Ry. Co., 59 Tex. Civ. App. 387, 126 S. W. 619; T. & P. Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049; T. & P. Coal Co. v. Kowsikowsiki, 103 Tex. 173, 125 S. W. 3; M., K. & T. Ry. Co. v. Greenwood, 40 Tex. Civ. App. 252, 89 S. W. 810 (writ of error refused); Garrett v. Hunt (Tex. Com. App.) 283 S. W. 489.

In T. & P. Coal Co. v. Kowsikowsiki, 103 Tex. 173, 125 S. W. 3, 4, cited above, our Supreme Court, in holding that the judgment could not be supported on inferences there relied on, had this to say: "Again it is said that the defendant was in a position to clear away all these doubts. This consideration has force where a plaintiff has proved a state of facts which, while not free from question, is yet sufficient, in the absence of explanation, to give rise to an inference of negligence on the part of defendant. But it has no application where the facts shown are equally consistent, as they are in this case, with all these hypotheses, viz., that the injury was caused (1) by the negligence of deceased, or (2) by that of defendant, or (3) by that of both deceased and defendant. 6 Thompson on Neg. § 7698 and cases cited."

In Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 233, 74 L. Ed. ——, the following was quoted with approval from a former decision of the same court: "When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither."

In another decision by the same court, New York Central Railroad Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 199, 74 L. Ed. ——, a judgment allowing a recovery for the death of an employee was reversed for lack of sufficient evidence to support it. There was no eyewitness to the accident, but plaintiff relied on circumstantial evidence to sustain a recovery. In disposing of that case the court said: "In any view of the matter, the respondent (plaintiff), upon whom lay the burden, completely failed to prove that the accident was proximately due to the negligence of the company. It follows that the verdict rests only upon speculation and conjecture, and cannot be allowed to stand. Chicago Co. v. Coogan, 271 U. S. 472, 478, 46 S. Ct. 564, 70 L. Ed. 1041, and cases cited. The utmost

that can be said is that the accident may have resulted from any one of several causes, for some of which the company was responsible, and for some of which it was not. This is not enough."

In Slocum v. Erie Railroad Co. (C. C. A.) 37 F.(2d) 42, 44, the court said: "The jury were allowed to infer that there was an unusual jar from the mere fact that the decedent fell from the car. The witnesses testified to no such jar, but quite to the contrary, and there was no proof of how or why Slocum fell. He may have stumbled or fainted. Whatever the cause, there was no evidence justifying the inference that it was the neglect to warn him of the turning off of the steam and the running in of the slack. * * * From whatever point of view we analyze the evidence of this unfortunate accident, we reach the conclusion that there was no proof of negligence on the part of the railroad which caused the death of Slocum."

In Betcher v. Southern Pacific Co. (C. C. A.) 29 F.(2d) 735, a judgment in favor of the plaintiff for the death of a caretaker who fell between two cars and the negligence upon which a recovery was sought consisted of allegations that the accident was occasioned by a failure of the engineer to sound warning signals before starting the train. In that case the following was said: "We are of opinion that the alleged failure of the engineer to sound two blasts of the whistle, as a signal that the train was about to start, was not shown to be the proximate cause of Witham's death. The theory of appellants is that he was stooping over the vents and was thrown off his balance, although it would seem that the taking up of slack would have given him time to brace himself as effectually as would a signal from the engine. There is no direct evidence on the subject. The circumstances leave the proximate cause in doubt, and are as consistent with the inference either that Witham stumbled, or fell between the cars, as they are with the theory of appellants. The result is that the evidence is equally consistent with two or more theories, so that it is impossible to determine the real cause of the accident."

To the same effect are the decisions in the following cases: Williams Sign Co. v. Rodgers (Tex. Civ. App.) 24 S.W.(2d) 478; Mayor v. Breeding (Tex. Civ. App.) 24 S.W.(2d) 544; Patton v. Texas & Pacific Railroad Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361.

Upon those authorities the writer is of the opinion that the assignment of error, addressed to the refusal of the court to instruct a verdict in favor of the defendant, should be sustained.

The writer is of the opinion further that the assignment of error to the refusal of the court to permit the test to be made in the presence of the jury of the model which was

constructed by the defendant's car foreman, W. K. Smith, which ruling is referred to and discussed in the opinion of Justice Buck on original hearing, should be sustained. Smith was introduced as a witness by the defendant, and testified that the running board on the model was an exact replica of that on the cattle car in controversy; that he had examined the lumber of the running board and found that while the same had apparently been in use for several years, the lumber was sound and on account of its seasoned condition the end of the running board was less flexible than that shown in the model, which was constructed of new lumber. After testifying to the examination made of the running board on the cattle car in question, he testified as follows: "The material was sound. I had occasion to step across from the running board extension of the caboose over on to the running board extension of the stock car. It did not have a tendency to give down when I stepped on it. It was firm and solid. * * * I have no way of telling how long that stock car running board and its extension had been in service only by the preservation and appearance of it. The car was twelve or fifteen years old. * * * There is not anything unusual for a car twelve or fifteen years old to have a running board on it about a year old; that is nothing unusual; it is nothing uncommon to renew all woodwork of a car; * * * There is approximately an inch and one half vibration in the springs. This vibration in the springs has something to do with the vibration of the running board extension. I would say it had ninety per cent. to do with it. Yes, I have had train service. I mean to say the springs have as much as ninety per cent. to do with the vibration; you ride in your automobile and you know how much your spring vibrates. The vibration of the car is due ninety per cent. to the springs. I know that from my experience in riding. I mean to say just the ordinary running of the car with those springs and the condition the bracket was in, with those nuts off, the situation of vibration was due ninety per cent. to the springs of the car."

The bill of exception shows that the test proposed to be made in the presence of the jury which the court refused to permit was with only one of the metal supports of the running board extension in place and the other one turned down.

It seems clear to the writer that the actual test proposed would have given the jury a better idea of whether the end of the running board could have sprung down sufficiently to cause the deceased to fall, and that defendant was entitled to the benefit of that proof.

Accordingly, the writer is of the opinion that the motion for rehearing should be granted and the judgment of the trial court reversed and that judgment should be here rendered in favor of the appellant upon the assignment addressed to the refusal of the court to instruct a verdict in favor of the defendant; but if the case be not finally disposed of under that assignment, that at all events the judgment should be reversed and the cause remanded.